Jack L. THOMAS, Individually, on behalf of the Tru–Tech, Incorporated Pension Plan, and as a representative of a class of plaintiffs similarly situated, Plaintiff–Appellee,

v.

D. Grant PEACOCK, Defendant–Appellant,

and

Alan H. Finegold, Defendant.

Jack L. THOMAS, Individually, on behalf of the Tru–Tech, Incorporated Pension Plan, and as a representative of a class of plaintiffs similarly situated, Plaintiff–Appellee,

v.

D. Grant PEACOCK, Defendant–Appellant,

and

Alan H. Finegold, Defendant.

Jack L. THOMAS, Individually, on behalf of the Tru–Tech, Incorporated Pension Plan, and as a representative of a class of plaintiffs similarly situated, Plaintiff–Appellee,

v.

TRU–TECH, INC.; D. Grant Peacock, Defendants–Appellants,

and

Grant Peacock and Company, Inc.; Connecticut General Life Insurance Company, Defendants.

Nos. 92–2524, 93–1394 and 93–1469.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1994.

Decided Nov. 4, 1994.

**ARGUED:** David Lynn Freeman, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC, for appellants. J. Kendall Few, Greenville, SC, for appellee. **ON BRIEF:** J. Theodore Gentry, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC, for appellants. James R. Gilreath, Greenville, SC, for appellee.

Before RUSSELL and WIDENER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Affirmed in part and vacated and remanded in part by published opinion. Judge RUSSELL wrote the opinion, in which Judge WIDENER and Senior Judge CHAPMAN joined.

**OPINION**

DONALD RUSSELL, Circuit Judge:

Jack L. Thomas ("Thomas"), a former employee of Tru–Tech, Inc. ("Tru–Tech"), brought a suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, on behalf of a class of former Tru–Tech employees against Tru–Tech and D. Grant Peacock ("Peacock"), an officer and shareholder of Tru–Tech. The district court held for the plaintiff class as against Tru–Tech, but held Peacock not liable as a plan fiduciary. *Thomas v. Tru–Tech, Inc.,* No. 87–2243–3, 1988 U.S.Dist. LEXIS 15929, 1988 WL 212511 (D.S.C. Nov. 28, 1988). On appeal, we affirmed the district court's judgment in all respects. *Thomas v. Tru–Tech, Inc.,* 900 F.2d 256 (4th Cir.1990) (unpublished disposition; full text reported at 1990 WL 48865).

Thomas then brought suit, purportedly on behalf of the plaintiff class certified in the earlier suit,[1] against Peacock, individually, and against Peacock's attorney, Alan H. Finegold ("Finegold"), seeking to collect the earlier judgment. Among various theories for recovery, Thomas sought to pierce Tru–Tech's corporate veil and reach Peacock. The district court rejected Thomas' claim against Finegold, but allowed plaintiffs to recover as against Peacock based upon their veil-piercing theory. *Thomas v. Peacock,* No. 7:91–3843–21, 1992 U.S.Dist. LEXIS 18749 (D.S.C. Oct. 28, 1992). Peacock appeals. We affirm.

Peacock also appeals the district court's assessment of attorneys' fees against him with respect to both litigations pursued by Thomas. We vacate the award of attorneys' fees and remand for further proceedings.

I.

In August of 1987, Thomas, on behalf of a class of similarly situated former Tru–Tech employees, filed suit against Tru–Tech and Peacock seeking payment of benefits due under Tru–Tech's pension plan (the "initial

---

1. Thomas describes this suit as a continuation of the prior class action and, accordingly, asserts that this suit is also brought on behalf of the class. As discussed *infra,* Peacock disputes this assertion.

litigation"). The complaint raised numerous claims for relief, including breach of fiduciary duty under ERISA. The district court found Tru–Tech, but not Peacock, to be a plan fiduciary; it further found that Tru–Tech had breached its fiduciary duties. On appeal, we affirmed the district court in all respects.[2]

Thomas subsequently sought to execute judgment against Tru–Tech in Pennsylvania, but was unsuccessful. Thomas then brought the present suit against Peacock, individually, and against Peacock's attorney, Finegold, on theories of civil conspiracy, fraudulent transfer of assets, and corporate veil-piercing under ERISA. The district court approved of plaintiffs' attempt to pierce Tru–Tech's corporate veil and determined that plaintiffs were entitled to collect from Peacock their earlier judgment against Tru–Tech; the court otherwise rejected plaintiffs' claims. Peacock appeals.

## II.

In 1981, Rockwell International decided to sell the textile machinery parts manufacturing business of its Draper Division; this business was conducted at two plants, one in Marion, South Carolina, and the other in Beebe River, New Hampshire. A Delaware corporation named Tru–Tech was organized for the purpose of acquiring this business. Tru–Tech maintained an office in Spartanburg, South Carolina; Bill Wilcock ("Wilcock") was appointed its president and chief executive officer. A partnership named Marion Limited Partners ("Marion LP") was established for the purpose of purchasing the Marion, South Carolina, plant from Rockwell International and leasing it to Tru–Tech.

Among the investors in Tru–Tech was appellant Peacock. Peacock was the sole stockholder and director of Peacock, Williams & Company ("PW & C").[3] Peacock was a CPA and a lawyer who also served as a partner in Marion LP. Marion LP's sole general partner, however, was Wilcock.

Despite high hopes, Tru–Tech quickly fell on hard times.[4] When, by September of 1983, Tru–Tech had already lost a substantial sum of money, Wilcock was replaced by John H. Blackburn ("Blackburn"), previously Tru–Tech's vice president of operations. When Tru–Tech's board determined that it was not viable for Tru–Tech to continue in business, it became Blackburn's responsibility to liquidate Tru–Tech's assets.

In 1985, Tru–Tech relocated its offices to space rented by PW & C in Pittsburgh, Pennsylvania. Timothy H. Williams ("Williams"), PW & C's president, assumed the role of Tru–Tech's executive vice president, treasurer and secretary. From late 1986 through late 1988, PW & C billed Tru–Tech for incidentals such as telephone, travel, entertainment, legal, postal and office supply expenses. Peacock testified that, at that time: "We ha[d]n't been keeping the accounting records ... for Tru–Tech since it had no employees." J.A. 345.

By February of 1986, Tru–Tech had managed to sell all of its productive assets in

---

2. We summarized the facts underlying the initial litigation in our earlier opinion, *see* 1990 WL 48865, at *1–*2.

3. In fact, PW & C was first called D. Grant Peacock & Company, and then Peacock, Williams & Company; it subsequently reverted to its original name. For ease of reference, we refer to it throughout our opinion as "PW & C."

4. The district court noted:

The promoters and founders of Tru–Tech expected the business to derive substantial revenue primarily from two sources. First, they expected to continue supplying parts to Rockwell's Draper Division which manufactured looms. Second, they believed that Tru–Tech had purchased the tooling for Draper parts and that they could sell these parts on the open market. Unfortunately, their expectations did not come to fruition and the business failed.

Despite the general sluggishness in the textile industry at the time, the demise of Tru–Tech can be attributed to two events that occurred simultaneously. First, within six months of Tru–Tech's purchase of Rockwell's Draper parts manufacturing business, Rockwell sold its Draper Division to another group of investors who immediately reduced inventories, thus severely reducing orders Tru–Tech expected to fill. Second, the "new" Draper filed suit against Tru–Tech alleging that Draper, not Tru–Tech, had the tooling rights for Draper parts. It was determined subsequently that Draper had in fact retained these rights, and it was at this point that Tru–Tech's potential for profit was eliminated.

1992 U.S.Dist. LEXIS 18749, at *3–*4.

South Carolina. Operations at the Beebe River Plant in New Hampshire ceased in June of 1986 and management sought to liquidate the assets at that plant to reduce Tru–Tech's financial liabilities. Despite this effort, Tru–Tech's negative net worth continued to increase from $893,676.00 on September 30, 1986, to $1,376,888.00 by September 30, 1990.

As Tru–Tech's troubles continued to mount, Peacock took it upon himself to "buy out" other investors who, purportedly, could less well withstand the impact of Tru–Tech's financial downturn than could he. As a result, by 1987, Peacock controlled in excess of 70% of Tru–Tech's stock. This domination continued until 1990,[5] when, on Finegold's advice, Peacock sold 724,980 shares to Williams and Blackburn for $200 in order to bring his holdings below the 50% mark. Moreover, from March 1988 until February 1990 and, effectively, until Tru–Tech's final dissolution in May 1990, Peacock served as the company's sole director.

Peacock testified that, following the suspension of Tru–Tech's operations, in July 1986, Blackburn was placed on PW & C's payroll for the purpose of "wrapping-up Tru–Tech's affairs." For this service and for the rent for a portion of PW & C's office in Pittsburgh, PW & C billed Tru–Tech $10,000 each month; this liability eventually grew to more than $110,000. PW & C issued invoices to Tru–Tech which described the $10,000 a month charge as levied for the services rendered by Blackburn, an engineer by trade, as having been billed for "FINANCIAL CONSULTING SERVICES." *E.g.*, J.A. 443. This liability was not long maintained on PW & C's books, however, since, according to an August 3, 1989, memorandum to Williams, "the management fee receivable of [approximately] $110,000 was written off in the year ended 1/31/87." J.A. 593. Nevertheless, as described below, Tru–Tech receivables were subsequently transferred from Tru–Tech to PW & C and to other Peacock-affiliated entities, purportedly in consideration for this liability owed PW & C by Tru–Tech.

On November 28, 1988, as described above, the district court entered judgment in favor of the plaintiff class against Tru–Tech, which timely filed its notice of appeal, leaving Tru–Tech beset by numerous large liabilities, including the *Thomas* judgment, some $50,000 owed to PW & C and approximately $350,000 owed to Peacock individually. After discussions with Peacock concerning the *Thomas* judgment against Tru–Tech, Finegold, by letter dated March 2, 1989, advised Peacock:

> I see no reason for any payment with regard to the Thomas litigation unless and until the judgment becomes final and constitutes a lien on real estate held for sale. As I understand the situation, the corporation owns no real estate in South Carolina and the plaintiffs have made no effort to attach the corporation's property in New Hampshire at this time. It remains quite desirable then, to effect the disposition, for acceptable consideration, of the New Hampshire realty before the plaintiffs attempt to reach it. You will need, nevertheless, to pay any legal fees owed to Tru–Tech, Inc.'s counsel in the Thomas case in order to keep them involved in the appeal process.

J.A. 625 ¶ c. The letter goes on to suggest, as a means of "protect[ing] the [Tru–Tech] real estate against any claims in the Thomas case and to preserve some possibility of recovery of some portion of the amounts owed to you and your corporation, ... an arrangement," J.A. 625–26, under which a new corporation would be formed in New Hampshire for the purpose of assuming ownership of the Tru–Tech real estate. Finegold advised that "the arrangement suggested allows you and Peacock, Williams & Company to recover $130,000 if the new corporation eventually succeeds in consummating the sale of the premises," J.A. 626, subject to the proviso that "the possibility exists of treatment of the transfer as a voidable preference," J.A. 626.

Peacock and Finegold then held a meeting to discuss further the subject of the Tru–Tech judgment, "as a consequence of which," J.A. 628, Finegold, in a March 13, 1989 letter,

---

**5.** Although the stock certificates exhibit dates in 1987, they were not forwarded to Blackburn for his signature until 1990.

identified for Peacock "the various matters on which we had settled as a strategy," J.A. 628, including, in particular, the following:

> (3) The [Tru–Tech] corporation will refrain, for the time being, from payment of any obligations arising out of the Thomas litigation, pending further developments on this front.

> . . . .

> (7) The [Tru–Tech] corporation will, with the use of its receivables, pay down the amounts owed to Peacock, Williams & Company and to you, personally, in order to start running the one year period for avoidance of preferences to control persons in bankruptcy.

J.A. 628.

The "strategy" outlined in Finegold's letters to Peacock was never fully implemented. Still, several questionable transactions were executed during this general time frame. We summarize them here.

On April 30, 1988, a $31,804 Tru–Tech receivable from Marion LP was "netted on Tru–Tech's books" so as to become a receivable of PW & C. J.A. 433.

By authorization dated on October 31, 1988, Peacock, as sole director of Tru–Tech, transferred a $27,235.08 Tru–Tech receivable known as the "Uhlman note" to Finegold and Peacock's wife as trustees of the D. Grant Peacock trust, the beneficiary of which is Peacock's wife. In return for this transfer, Finegold claimed, by letter dated April 3, 1989, to have forwarded to Peacock checks payable to Tru–Tech for $27,235.08. The letter requests that Peacock furnish Finegold with "a schedule showing the application by Tru–Tech of the $27,235.08 paid, an application which, I assume, involves some favored creditors like Peacock, Williams & Company, Incorporated." J.A. 618.

Judge Traxler concluded "that there was either no consideration paid for the assignment of the Uhlman note on October 31, 1988, or the assignment was simply backdated to reflect that as the supposed date of transfer," 1992 U.S.Dist. LEXIS 18749, at *12, and, further, "that the purpose of the sale of the Uhlman Note was to get enough cash into Tru–Tech to pay the $25,000 retainer to Greenville [counsel] for the purpose of handling the appeal of the Thomas judgment," id.; October 31, 1988, the purported date of the sale, predates the entry of judgment in favor of plaintiffs in the original trial.

At a March 6, 1989, Tru–Tech board meeting attended by Peacock, Finegold and Blackburn, Peacock agreed to pay $130,000 of Tru–Tech funds to PW & C. Peacock asserts that this was to repay PW & C for money paid to Blackburn to manage Tru–Tech's affairs, even though, prior to that date, the evidence showed that PW & C had "written off" that amount due.

On a June 26, 1989, Tru–Tech pro forma balance sheet, Peacock made a handwritten note that a $47,000 Tru–Tech receivable known as the "Brodsky note" should be transferred to PW & C. Further, next to numerous balance sheet liability entries, including the entry "Judgment—Jack Thomas Case" as well as entries for interest thereon and estimated attorneys' fees, is the handwritten word, "Forget." J.A. 542.

By unanimous consent order dated July 1, 1989, the Tru–Tech board of directors, of which Peacock was by then the sole member, approved the transfer of the Brodsky note to PW & C "for accounts payable owed by Tru–Tech to Peacock Williams." J.A. 590. Blackburn, as Tru–Tech's president, formally executed the transfer on October 20, 1989, "for consideration paid," J.A. 588.

On November 1, 1989, Tru–Tech assigned a $5,737.75 receivable from Marion LP to PW & C.

On February 15, 1990, Peacock resigned as a director of Tru–Tech. Yet, as late as May of that year, Peacock continued to sign checks, drawn on Tru–Tech's bank accounts, for legal fees.

On April 26, 1990, Blackburn tendered his letter of resignation as Tru–Tech's president. Nevertheless, for some six months thereafter, Blackburn remained on PW & C's payroll and continued to oversee the "wrapping up" of Tru–Tech's affairs.

On May 1, 1990, Williams resigned as Tru–Tech's executive vice president, treasurer and secretary. Yet, on May 4, 1990, he

authorized the assignment of a $5,000 mortgage from Tru–Tech to PW & C.

When, in 1990, the plaintiff class, by way of Pennsylvania counsel, served interrogatories on PW & C, Finegold, and Peacock and his wife, Finegold responded, by letter dated August 30, 1990:

> [A]s I understand the situation, Tru–Tech, Inc., ... has discontinued its businesses, and disposed of all its fixed assets ...; and all of its directors and officers with any detailed knowledge of the businesses and affairs of the corporation have resigned. As a practical matter, then, the corporation is defunct; and there is no one known to Grant Peacock or to me who has the authority and knowledge to prepare the answer demanded to the interrogatories propounded.

J.A. 632.

Based on the foregoing, the district court found that Peacock failed to observe the traditional corporate format and engaged in a "corporate strategy" with "the specific intent and purpose ... [of] siphon[ing] off [Tru–Tech's] assets to favored creditors owned or controlled by Peacock and to defeat collection of the *Thomas* judgment." 1992 U.S.Dist. LEXIS 18749, at *19. Peacock appeals.

### III.

Peacock argues that this suit is one merely to collect an outstanding judgment and that, because ERISA is not thereby implicated, the district court lacked subject matter jurisdiction over this case.[6] He also argues that, even if the district court properly exercised jurisdiction, it erred in applying a federal common law, as opposed to state law, standard for piercing the corporate veil. Proper evaluation of these contentions requires that we examine the nature of an attempt to pierce the corporate veil.

As we explained in *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976):

> [I]t is recognized that a corporation is an entity, separate and distinct from its officers and stockholders, and that its debts are not the individual indebtedness of its stockholders. This is expressed in the presumption that the corporation and its stockholders are separate and distinct.... But this concept of separate entity is merely a legal theory ... and the courts "decline to recognize [it] whenever recognition of the corporate form would extend the principle of incorporation 'beyond its legitimate purposes and [would] produce injustices or inequitable consequences.' "

*Id.* at 683 (citation and footnote omitted) (quoting *Krivo Indus. Supply Co. v. National Distillers and Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir.1973), *modified,* 490 F.2d 916 (1974)).

■ "An attempt to pierce the corporate veil is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action...." 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41, at 603 (perm. ed. rev. vol. 1990).[7] However, although an attempt to pierce the corporate veil is necessarily subsidiary to some primary cause of action, it is not simply an attempt to collect a preexisting liability against an entity already found liable under the relevant substantive law; it is, rather, an attempt to impose such a preexisting liability upon an entity *not otherwise liable.* See *Sandlin v. Corporate Interiors Inc.*, 972 F.2d 1212, 1217 (10th Cir. 1992) (in a "cause of action based upon the alter ego theory[,] ... in theory the court is merely trying to identify the true debtor on the judgment"). Thus, the doctrine of piercing the corporate veil is not a mere procedural rule relating to "how" a judgment is to be enforced, but is, rather, a substantive rule of liability. See *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir.1988) (holding that, in diversity case, federal district court properly applied New Jersey substantive law of veil-piercing). Last, we note that "the doctrine of piercing the corporate

---

**6.** It is undisputed that there is no diversity of citizenship in this action, and that there is no basis for federal question jurisdiction other than the fact that the suit seeks to enforce a judgment obtained pursuant to ERISA.

**7.** We note that, at page 27 of his brief, Peacock, albeit in another context, relies upon this very excerpt from Professor Fletcher's treatise.

veil is an equitable one." 1 Fletcher, *supra,* § 41, at 603.

### IV.

■ Peacock argues that, once the plaintiff class won its judgment against Tru–Tech, it became a judgment creditor, like any other. The district court, he argues, therefore lacked subject matter jurisdiction over Thomas' attempt to pierce the corporate veil. We reject this argument.

It is black letter law that

the jurisdiction of a court is not exhausted by the rendition of the judgment, but continues until that judgment shall be satisfied.... Process subsequent to judgment is as essential to jurisdiction as process antecedent to judgment, else the judicial power would be incomplete and entirely inadequate to the purposes for which it was conferred by the Constitution.

*Riggs v. Johnson County,* 73 U.S. (6 Wall.) 166, 187, 18 L.Ed. 768 (1867). We established above that an attempt to pierce the corporate veil is a matter of substantive law that determines whether a corporate shareholder can be held liable for a preexisting judgment entered against the corporation. An attempt to pierce the corporate veil, therefore, seeks to identify those parties against whom the judgment can be satisfied. Because identification of those parties who are liable is necessarily antecedent to procedural enforcement of the judgment against those parties, and because *Riggs* establishes that federal courts have "ancillary" jurisdiction over enforcement of judgments, it would seem that the federal courts' "ancillary" jurisdiction would extend to the instant attempt to pierce the corporate veil.

Before we leave the issue, however, we must assure ourselves that our conclusion is in accord with the Supreme Court's holding in *H.C. Cook Co. v. Beecher,* 217 U.S. 497, 30 S.Ct. 601, 54 L.Ed. 855 (1910).[8] There, a Connecticut corporate patentholder brought a patent infringement suit in federal court against another Connecticut corporation. During the pendency of the suit, the directors of the defendant corporation voted to continue sales in alleged violation of the plaintiff's patent. Plaintiff proved the victor in the patent infringement case but was unable to collect from the defendant corporation, which was by then insolvent.

Plaintiff then filed a second suit in federal court against the directors of the insolvent corporation. In its complaint, plaintiff alleged that the defendants voted to continue sales "kn[o]w[ing] that [insolvency] would be the result of a judgment against [their corporation in the first suit], but did the acts alleged for the purpose of increasing the value of their stock in the company, and of receiving the profits and dividends that might be received from the sale." *Id.* at 498, 30 S.Ct. at 601–02.

On plaintiff's appeal of the second suit, Justice Holmes, writing for the Court, rejected plaintiff's characterization of the suit as one to hold the directors jointly and severally liable with their corporation for their part in infringing plaintiff's patent, *id.,* instead according plaintiff's complaint its "natural interpretation [as] an attempt to make the defendants answerable for the judgment already obtained," *id.* The Court then sum-

---

**8.** The Seventh Circuit in *Argento v. Village of Melrose Park,* 838 F.2d 1483, 1488 (7th Cir. 1988), discounted the Justice Holmes' opinion in *Beecher* as a "case, decided over 75 years ago, [that] is three paragraphs long containing a conclusion, but virtually no discussion." Further, noted that Court, "[i]t has rarely been cited as precedent." *Id.* We are skeptical of the Seventh Circuit's notion that, as an inferior court, we may evade Supreme Court precedent on grounds of "desuetude." *Cf. United States v. Chase,* 18 F.3d 1166, 1169 (4th Cir.1994) ("Although there has been little discussion of [*Ball v. United States,* 140 U.S. 118, 11 S.Ct. 761, 35 L.Ed. 377 (1891),] since it was decided in 1891, the Supreme Court and the Eighth Circuit, in deciding other issues,

have recognized its continued vitality."). Nor are we convinced, as was the Third Circuit in *Skevofilax v. Quigley,* 810 F.2d 378, 385 n. 5 (3d Cir.) (en banc), *cert. denied,* 481 U.S. 1029, 107 S.Ct. 1956, 95 L.Ed.2d 528 (1987), that "Justice Holmes probably intended the [*Beecher*] opinion to be an interpretation of the ... governing statute," and that the possibility that Justice Holmes might have "intended his opinion to serve as a pronouncement on the constitutional limits of ancillary jurisdiction" should be dismissed because "he certainly kept that intention to himself, for it is nowhere mentioned in the opinion." In any event, we may assume *Beecher*'s continuing vitality, for the case is distinguishable on its facts from the case now before us.

marily concluded that the case "of course [did] not" fall within the federal court's ancillary jurisdiction. *Id.* at 499, 30 S.Ct. at 602. The Court concluded: "[I]f the directors are under obligations by Connecticut to pay a judgment against their corporation, that is not a matter that can be litigated between citizens of the same State in the Circuit Court of the United States." *Id.*

*Beecher* is factually distinguishable from the case at bar. While the instant case involves allegations that Peacock deliberately engaged in improper transfers and improperly ignored corporate formalities with the specific purpose of evading the already-extent judgment against Tru–Tech, *Beecher* involved an allegation that corporate directors, acting within their legal capacity, voted to continue sales of a product which was the subject of a then-pending patent infringement suit. *Beecher*, however, does make clear that the mere fact that a "former judgment [provides] the foundation of [a subsequent] case," *id.*, is insufficient, alone, to establish that the subsequent case falls within the federal court's ancillary jurisdiction. In particular, where the subsequent action is truly "independent" of the former action and judgment, there is no ancillary jurisdiction. *See Sandlin v. Corporate Interiors Inc.*, 972 F.2d 1212, 1217 (10th Cir.1992) ("We read *Beecher* as saying that when postjudgment proceedings seek to hold nonparties liable for a judgment on a theory that requires proof

on facts and theories significantly different from those underlying the judgment, an independent basis for federal jurisdiction must exist."); *Berry v. McLemore*, 795 F.2d 452, 455 (5th Cir.1986) ("garnishment actions against third parties are construed as independent actions from the primary action which established the judgment debt" and, therefore, the "court's ancillary jurisdiction to enforce its judgment does not extend to these garnishment actions").[9]

Without defining the precise contours of when a subsequent litigation is "independent" of a former litigation and judgment, we believe that Thomas' attempt to pierce the corporate veil is not "independent" of the initial litigation herein. As noted above, an attempt to pierce the corporate veil is necessarily subsidiary to some primary cause of action. That Thomas opted to file a separate action to pierce Tru–Tech's corporate veil is irrelevant: the court's subject matter jurisdiction does not turn on whether Thomas pursued the procedurally proper route. Further, we do not believe that the possibility that Thomas may not have been able to pursue this litigation at the same time as the initial litigation should affect the fact that this is, at bottom, a proceeding the goal of which is to collect the judgment earlier obtained by the plaintiff class. *Cf. Sandlin v. Corporate Interiors Inc., supra*, 972 F.2d 1212;[10] *but cf. Blackburn Truck Lines, Inc.*

**9.** We do not, by our citation of the Fifth Circuit's decision in *Berry*, mean to imply a holding that garnishment actions against third parties are, in fact, "independent actions from the primary action which established the judgment debt"; that issue, of course, is not now before us.

**10.** In *Sandlin*, a successful age discrimination plaintiff sought to collect judgment against the owners of the debtor corporation, who were not parties to the initial age discrimination litigation, on an alter ego theory. The Tenth Circuit read *Beecher*, which it described as "[a] typically cryptic Justice Holmes opinion," 972 F.2d at 1217, to say "that when postjudgment proceedings seek to hold nonparties liable for a judgment on a theory that requires proof on facts and theories significantly different from those underlying the judgment, an independent basis for federal jurisdiction must exist," *id.* Purporting to apply that standard to the case before it, the court, "[w]ithout attempting to decide all future cases, when the alter ego contentions may be more intertwined with the merits of the underlying claim

within the court's primary jurisdiction, we hold the district court properly dismissed the instant alter ego claims." *Id.* at 1218. The court reached this conclusion on the grounds that the attempt to invoke the alter ego doctrine involved "significantly different factual proof, new parties, [and] prejudgment actions." *Id.* By contrast, the court indicated that "[p]ursuing the new parties ... on a successor theory" would be viable to the extent that plaintiff could allege "postjudgment transfers of [the corporate debtor's] property." *Id.* (citing *Christiansen v. Mechanical Contractors Bid Depository*, 404 F.2d 324 (10th Cir.1968)).

The Tenth Circuit's holding in *Sandlin* is not inconsistent with, and, indeed, can be read to support, our conclusion herein. First, the case at bar involves primarily conduct by Peacock occurring after the judgment in the initial litigation was obtained. Moreover, to whatever extent the Tenth Circuit may properly have observed that, for jurisdiction to lie, "alter ego contentions [should] be [somewhat] intertwined with the merits of the underlying claim," we note that the

*v. Francis,* 723 F.2d 730 (9th Cir.1984)[11]. There is, in short, simply no practical reason to treat this litigation as separate from the initial litigation.[12] *Cf. Pineville Real Estate Operation Corp. v. Michael,* 32 F.3d 88 (4th Cir.1994) (holding that there is no federal question jurisdiction over case where the plaintiff brought action against defendants who had, in an earlier ERISA case, obtained judgments against the plaintiff, seeking to enjoin state enforcement of the judgment liens obtained by defendants and where the only federal statute or rule relied upon in plaintiff's complaint was Fed.R.Civ.P. 54(b)).

Peacock places heavy reliance upon the Supreme Court's statement in *Mackey v. Lanier Collection Agency & Service,* 486 U.S. 825, 833, 108 S.Ct. 2182, 2187, 100 L.Ed.2d 836 (1988), that "ERISA does not provide an enforcement mechanism for collecting judgment won" in either actions brought against plans by purported beneficiaries or in actions brought by general creditors of the plan, *see* ERISA § 502, 29 U.S.C. § 1132. Peacock reads this statement out of context. The *Mackey* Court immediately proceeded to note that, while ERISA did not provide for an enforcement mechanism, where suit is filed in federal court, judgment enforcement is conducted pursuant to Federal Rule of Civil Procedure 69(a), which adopts state law for judgment enforcement mechanisms. 486

U.S. at 833–34, 108 S.Ct. at 2187–88. Thus, the mere fact that ERISA may not provide an explicit mechanism for judgment enforcement does not mean that ERISA does not provide *jurisdiction* for judgment enforcement. Therefore, even assuming, *arguendo,* that piercing the corporate veil is merely a method of judgment enforcement,[13] *Mackey* does not undermine but, rather, supports the district court's exercise of jurisdiction.

Peacock also claims that the Supreme Court's decision in *Mertens v. Hewitt Associates,* —— U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), establishes that the instant litigation against him was improperly maintained. We disagree. In *Mertens,* the Court held that ERISA provides for no action for monetary damages against nonfiduciaries. The current attempt by plaintiffs is not, however, as discussed above, an independent action for monetary damages against a nonfiduciary, but an equitable attempt to satisfy a previous judgment entered against a fiduciary.

We therefore conclude that jurisdiction was proper in the district court.

## V.

■ Having determined that the court below properly exercised jurisdiction over Thomas' claim, we now turn to whether the district court applied the proper legal stan-

---

district court here found that Peacock engaged in a strategy with "the specific intent and purpose ... [of] siphon[ing] off [Tru–Tech's] assets to favored creditors owned or controlled by Peacock and to defeat collection of the *Thomas* judgment." 1992 U.S.Dist. LEXIS 18749, at *19.

**11.** In *Francis,* the plaintiff, who was unable to collect upon default judgments it previously had obtained against two bankrupt corporations, brought suit against the three owners of both corporations, seeking to pierce the corporate veil. The court of appeals held that jurisdiction was proper in the district court. Reasoned the court: "In one sense this suit is an effort to enforce the initial default judgment; in another sense it is an effort to accomplish what a joinder might have provided." *Id.* at 732.

We do not believe that the Ninth Circuit's reference to joinder has bearing here. This is because Peacock was in fact a party to the initial litigation, although not in the same capacity as he was in the phase of litigation now under review. Moreover, plaintiffs presumably could not successfully have pursued their veil-piercing

claim because most of the actions which led the district court to its conclusion had then yet to occur. Nevertheless, we do not think that these differences warrant a different conclusion as to jurisdiction. Especially where, as here, a stockholder has deliberately manipulated corporate assets in order to frustrate the ability of one who holds a judgment against the corporation by virtue of federal law, we think it clear that the federal courts have jurisdiction to ensure that the federal judgment is ultimately collected. To the extent that the Ninth Circuit's opinion in *Francis* suggests otherwise, we respectfully disagree.

We would note that the *Francis* court made no mention of the Justice Holmes' opinion in *Beecher.*

**12.** For this reason, we reject Peacock's challenge to the venue of the instant litigation, as well as his contention that the district court erred in failing to certify the plaintiff class for purposes of the instant litigation.

**13.** We, in fact, consider and reject this argument below.

dard in adjudicating Thomas' attempt to pierce Tru–Tech's corporate veil.[14] The district court relied upon a federal common law rule for piercing the corporate veil in ERISA cases. Peacock argues that the Supreme Court's decision in *Mackey* forecloses the existence of a federal common law veil-piercing rule in ERISA actions. We disagree. The *Mackey* Court held that "ERISA does not provide an enforcement mechanism for collecting judgments won in" suits brought by plan beneficiaries, pursuant to ERISA § 502(a)(1)(B), (d), 29 U.S.C. § 1132(a)(1)(B), (d), against ERISA benefit plans. Even assuming, *arguendo*, that ERISA also does not provide an enforcement mechanism for collecting judgments won in suits brought by plan beneficiaries, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), such as the initial litigation won by plaintiffs,[15] *Mackey* would only preclude a federal common law veil-piercing rule in ERISA actions to the extent that an attempt to pierce the corporate veil is merely an enforcement mechanism for collecting a judgment. It would be error, however, as we discuss above in Section III, to characterize the doctrine of piercing the corporate veil as a mere judgment enforcement mechanism. Because a rule of veil-piercing determines *who* is liable for breaches of ERISA fiduciary duties, we believe that ERISA preempts any state law of veil-piercing. *See* ERISA § 514(a), 29 U.S.C. § 1144(a); 1 Fletcher, *supra*, § 41.90, at 91 (Supp.1993) ("In disputes involving workers' claims to ERISA benefits, a federal court may apply a federal common law standard of corporate separateness.").

■ Having concluded that the determination of whether to pierce the corporate veil in an ERISA action is made under federal law, we turn to what standard the federal veil-piercing rule adopts. *See Phoenix Mut. Life Ins. Co. v. Adams*, 30 F.3d 554, 563–64 (4th Cir.1994). The First Circuit in *Alman v. Danin*, 801 F.2d 1, 3–4 (1st Cir.1986), explained:

> There is no litmus test in the federal courts governing when to disregard corporate form. The Supreme Court has, however, provided some guidance, stating that "the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when to do so would work fraud or injustice." *Taylor v. Standard Gas Co.*, 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669 (1939). The Court has further indicated that corporate form may not defeat overriding federal legislative policies. *See First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 630, 103 S.Ct. 2591, 2602, 77 L.Ed.2d 46 (1983); *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974). This court has said,
>
> > The general rule adopted in the federal cases is that "a corporate entity may be

**14.** Peacock argues that the doctrine of piercing the corporate veil has no place in ERISA actions at all. He argues that, wherever the corporate veil should be pierced so that a shareholder will be subject to the ERISA fiduciary liability of its corporation, ERISA, standing alone, should allow the shareholder to be sued as a fiduciary; piercing the corporate veil, he argues, adds nothing to ERISA, but "results [only] in an uncomfortable inconsistency: the imposition of liability on an individual who previously had been adjudged not to be a fiduciary and hence not to have any liability under ERISA's statutory scheme." Appellant's Br. 23.

We disagree. The tests for ERISA fiduciary liability and veil-piercing are not identical, especially where, as here, most of the activity leading to the conclusion of veil-piercing occurs *after* the activity pursuant to which the corporation is deemed to have breached its ERISA fiduciary duties.

Peacock also argues that *res judicata* should bar Thomas' claim here. Thomas, Peacock argues, could and should have brought his piercing claim at the same time as his ERISA claim. The record does not provide the support necessary to this argument, however: most of the transactions relied upon by Judge Traxler in piercing the corporate veil did not occur until *after* the completion of the initial ERISA litigation.

**15.** ERISA § 502(a)(2) allows for "[a] civil action [to] be brought ... by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2). ERISA § 409, 29 U.S.C. § 1109, in turn, imposes liability upon plan fiduciaries who breach their fiduciary duties. Plaintiffs, in the initial litigation, were successful in establishing, pursuant to ERISA § 409, 29 U.S.C. § 1109, that Tru–Tech was a fiduciary of the benefit plan it had established, and that Tru–Tech had breached its fiduciary duties.

disregarded in the interests of public convenience, fairness and equity," [citing *Capital Telephone Co. v. FCC*, 498 F.2d 734, 738 (D.C.Cir.1974) ]. In applying this rule, federal courts will look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form [citations omitted], an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine....

*Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981).

ERISA, the statute sought to be enforced here, cannot be said to attach great weight to corporate form. Indeed, deferring too readily to the corporate identity may run contrary to the explicit purposes of the Act. Congress enacted ERISA in part because many employees were being deprived of anticipated benefits, which not only reduced the financial resources of individual employees and their dependents but also undermined the stability of industrial relations generally. *See* 29 U.S.C. § 1001 (1982) (statement of congressional findings and declaration of policy); H.Rep. No. 807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, 4670, 4676. Allowing the shareholders of a marginal corporation to invoke the corporate shield in circumstances where it is inequitable for them to do so and thereby avoid financial obligations to employee benefit plans, would seem to be precisely the type of conduct Congress would want to prevent.

801 F.2d at 3–4. Several other circuits have followed similar reasoning. *Ellison v. Shenango Inc. Pension Bd. v. Snyder*, 956 F.2d 1268, 1274–75 (3d Cir.1992); *Janowski v. International Bhd. of Teamsters Local No. 710 Pension Fund*, 673 F.2d 931, 941 (7th Cir. 1982), *vacated on other grounds*, 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983); *see NLRB v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir.1993) (interpreting federal rule to allow veil piercing only where "(i) ... there [was] such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct and (ii) ... adherence to the corporate fiction [would] sanction a fraud, promote injustice, or lead to an evasion of legal obligations"). We, too, find this reasoning persuasive [16] and, accordingly, adopt the liberal veil-piercing standard enunciated by the First Circuit in *Alman* for use in ERISA actions. As a

---

**16.** We note that this federal common law veil-piercing rule accords with our understanding of the South Carolina rule, as expounded in our opinion in *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976). There, we explained that the "concept of [the corporation as a] separate entity is merely a legal theory ... and the courts 'decline to recognize [it] whenever recognition of the corporate form would extend the principle of incorporation beyond its legitimate purposes and [would] produce injustices or inequitable consequences.' " *Id.* at 683 (footnote omitted) (quoting *Krivo Indus. Supply Co. v. National Distillers and Chem. Corp.*, 483 F.2d 1098, 1106 (5th Cir.1973), *modified*, 490 F.2d 916 (1974)). We proceeded to stress that "proof of plain fraud is not a necessary element in a finding to disregard the corporate entity," *id.* at 684, and that "courts have experienced 'little difficulty' and have shown no hesitancy in applying what is described as the 'alter ego' or 'instrumentality' theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder," *id.* at 685 (quoting *Iron City Sand & Gravel Div. of McDonough Co. v. West Fork Towing Corp.*, 298 F.Supp. 1091, 1098 (N.D.W.Va.1969), *rev'd on other grounds*,

440 F.2d 958 (4th Cir.1971)). Thus, while the federal veil-piercing test may "usually give[ ] less respect to the corporate form than does the strict common law alter ego doctrine," *Town of Brookline*, 667 F.2d at 221, the South Carolina doctrine of veil-piercing accords with the ERISA veil-piercing standard announced in *Alman*. Compare *Perpetual Real Estate Servs., Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 549 (4th Cir.1992) (noting that the standard we set out in *DeWitt* is "not the law in Virginia," which sets more stringent standards for piercing the corporate veil).

In light of the foregoing, we observe that, to the extent that, "[w]hile the veil piercing inquiry in an ERISA case is ... rooted in federal law, state law is not rendered completely irrelevant," *United Elec., Radio and Machine Workers of America v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1092 n. 12 (1st Cir.1992), and that, in "apply[ing] federal substantive law, ... we may look to state law for guidance," *Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Serv., Inc.*, 736 F.2d 516, 523 (9th Cir.1984), the federal standard we apply accords with South Carolina veil-piercing law.

consequence, we conclude that the district court applied the correct legal standard in evaluating the plaintiff class' effort to pierce Tru–Tech's corporate veil.

## VI.

■ Peacock next argues that, on the facts presented, the district court erred in concluding that Tru–Tech's corporate veil should be pierced. We disagree. The district court found, as matters of fact, that Peacock owned a controlling (and, at most relevant times, a complete) interest in Tru–Tech and, from March of 1988 until its liquidation, served as Tru–Tech's sole director; that PW & C hired Blackburn to wind down Tru–Tech's business and, in turn, billed Tru–Tech $10,000 a month for financial services, and also for incidental expenses; and that numerous transfers were effected among Tru–Tech, PW & C, Peacock and others without proper consideration or formalities. On the basis of these facts, and others set out above, the court further found that Peacock engaged in a "corporate strategy" with "the specific intent and purpose ... [of] siphon[ing] off [Tru–Tech's] assets to favored creditors owned or controlled by Peacock and to defeat collection of the *Thomas* judgment." 1992 U.S. Dist. LEXIS 18749, at * 19. On the record before us, we cannot characterize these findings of fact as clearly erroneous.

We also review the district court's decision to pierce Tru–Tech's corporate veil under the clearly erroneous standard. *DeWitt Truck Brokers, Inc., supra,* 540 F.2d at 684; *accord Laborers Clean–Up Contract Admin. Trust Fund v. Uriarte Clean–Up Serv., Inc.,* 736 F.2d 516, 523 (9th Cir.1984) (reviewing, under the clearly erroneous standard, the district court's decision in an ERISA case to pierce the corporate veil). Under that limited standard of review, the district court's decision will not be disturbed.

Peacock's remaining arguments against the district court's judgment regarding the imposition against him of the Tru–Tech ERISA liability established in the initial litigation are without merit. We consequently affirm the district court's judgment in that regard.

## VII.

Following the determination by the district court in the initial litigation that Tru–Tech was liable while Peacock was not, District Judge G. Ross Anderson, Jr., entered an order allowing plaintiffs to defer any motion for attorneys' fees until final disposition of the initial litigation. Because of the appeal of the initial litigation and the subsequent attempt to pierce Tru–Tech's corporate veil, such a motion was not made until the instant litigation was complete in the district court. At that time, District Judge William B. Traxler, Jr., referred the matter back to Judge Anderson for determination of fees arising out of the initial litigation. Judge Anderson applied the five-factor test enunciated in *Reinking v. Philadelphia American Life Insurance Co.,* 910 F.2d 1210, 1217–18 (4th Cir.1990), to determine whether a fee award was appropriate, and, finding that one was, the twelve-factor test adopted in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 & n. 28 (4th Cir.), *cert. denied,* 439 U.S. 934, 99 S.Ct. 329, 58 L.Ed.2d 330 (1978), to fix the amount thereof. Ultimately, Judge Anderson decided that a fee of $123,181.25 was reasonable, along with costs of $13,103.60. Judge Traxler undertook a similar inquiry and analysis with respect to fees arising out of the veil-piercing litigation, concluding that $64,406.25 in attorneys' fees and $4,490.91 in costs were due. Thus, a total of $205,182.01 in attorneys' fees and expenses were assessed against Peacock. This, we note as a preliminary matter, exceeds the total damages assessed in this case. Peacock argues both that it was inappropriate for the district court to award attorneys' fees in this case and that, even if such an award was appropriate, the amount of the award was excessive. We reject Peacock's first argument but find his second argument persuasive.

■ In keeping with ERISA § 502(g)(1)'s explicit grant of discretion to the district courts to award "a reasonable attorney's fee," 29 U.S.C. § 1132(g), we review the district court's decision to award attorneys' fees solely for abuse of discretion, *Quesinberry v. Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1028 (4th Cir.1993) (en banc). Peacock argues that, because the initial litigation resulted in

his exoneration, any award of attorneys' fees is unjust here. The truly culpable party, Peacock suggests, is Tru–Tech. Because this argument ignores the district court's finding that Peacock was Tru–Tech's alter ego and was, himself, culpable for siphoning off Tru–Tech's funds, we reject it and find no abuse of discretion in the district court's decisions to award attorneys' fees arising out of both stages of litigation in this case.

■ Of far greater weight is Peacock's challenge to the *amount* of the fee awards announced by the district judges. Factor eight of the procedure established in *Barber v. Kimbrell's, Inc.* for fixing the amount of an attorneys' fee award is "the amount in controversy and the results obtained." 577 F.2d at 226 n. 28. This is "the most critical factor," in such an analysis. *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Yet, although the fee award for the initial litigation amounts to more than two-thirds of the total award resulting from that litigation, the district court, in its discussion of "the most critical factor" in the *Barber* analysis, focused on the result and the tenacity of the attorneys without mentioning the size of the proposed attorneys' fee and costs award in comparison with the total damage award.[17] A subsequent discussion in the district court's opinion justifies the disproportionate award by citation to cases discussing fee awards in the context of civil rights actions, and by asserting that the policies underlying ERISA are equally strong. This justification is without basis in law. We think it safe to say, without belittling the important interests which ERISA serves to protect, that the federal civil rights laws provide more vital protections and vindicate far more important interests. *Cf. Quesinberry,* 987 F.2d at 1030 (noting Congress' decision not to implement, in the ERISA context, "a mandatory fee shifting rule analogous to 42 U.S.C. § 1988"). As the Fifth Circuit has explained:

The policies underlying ERISA are certainly important ones, but they simply do not rise to the level of assuring that all citizens are accorded their civil rights. Not only are the policies that [ERISA] is designed to enforce less compelling than those furthered by [the civil rights laws], but the need for attorneys' fees as an enforcement incentive is less under ERISA than the ... civil rights statutes. Plaintiffs suing under the [civil rights laws] are "private attorneys general" in the sense that they seek injunctive relief to vindicate important public rights. If such "plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." *[Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968) ].* Plaintiffs under Title I of ERISA may be seeking injunctive relief for the benefit of all the participants and beneficiaries of a particular plan, but they may also be seeking damages on behalf of their plan or simply the recovery of benefits from the plan that are due them alone. Fiduciaries, moreover, may have a statutory obligation to bring ERISA suits. Thus, incentives in the form of attorneys' fees are, on the whole, less necessary to insure that the statute is enforced.

*Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1265–66 (5th Cir.1980) (footnotes omitted); *accord Ellison v. Shenango Inc. Pension Bd. v. Snyder,* 956 F.2d 1268, 1274–75 (3d Cir.1992); *Janowski v. International Bhd. of Teamsters Local No. 710 Pension Fund,* 673 F.2d 931, 941 (7th Cir.1982), *vacated on other grounds,* 463 U.S. 1222, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983). We agree with the position taken by other circuits in this regard. We therefore vacate the attorneys' fees determination entered by the district court with regard to the initial litigation.[18] On remand, the district court should

---

**17.** Nor did the district court discuss the size of the fee award in the context of another *Barber* factor, the attorneys' reasonable expectations at the outset of the litigation.

**18.** We also note that the district court, in assessing attorneys' fees with respect to the initial

litigation, made reference to plaintiffs' counsel's success in piercing Tru–Tech's corporate veil in the instant litigation. This was error. In proceeding under the "results obtained" factor in determining an appropriate fee award for the initial litigation, the district court should confine

recalculate, in a manner consistent with this opinion, the amount of attorneys' fees.

 With respect to the district court's assessment of attorneys' fees with regard to the instant attempt to pierce Tru–Tech's corporate veil, Peacock claims that the district court erred in failing to address whether any portion of the total hours spent by the plaintiffs' attorneys was devoted solely to plaintiffs' case against Finegold, which, as opposed to plaintiffs' case against Peacock, was not successful. We disagree. It is true that "no fees should be awarded for time spent on unsuccessful claims that were unrelated to successful ones." *Abshire v. Walls,* 830 F.2d 1277, 1282 (4th Cir.1987). Where, however, the facts of an unsuccessful claim are "inextricably intertwined" with those of a successful claim, fees for total time spent are appropriately awarded because both claims required investigation of a "common core of facts." Here, given Finegold's relationship to Peacock and his role in Peacock's and Tru–Tech's transactions, and the nature of the claims raised against Finegold, we conclude that the facts underlying all of the plaintiffs' claims in this litigation were "inextricably intertwined."

Peacock also raises several specific objections to the district court's assessment of attorneys' fees as to both phases of the litigation herein. First, Peacock cites numerous examples where the court, in assessing attorneys' fees with respect to both phases of litigation, awarded fees to cover the presence of both of plaintiffs' primary lawyers even though, Peacock claims, the presence of only one would have sufficed. *See Goodwin v. Metts,* 973 F.2d 378, 383–85 (4th Cir.1992). Second, Peacock claims that the district court awarded items of "cost" which do not fall within the definition of the term at 28 U.S.C. § 1920. Last, Peacock describes as excessive the time plaintiffs' counsel claim to have spent in preparing their fee petitions for submission to the district court and in performing unspecified tasks since the victory against Peacock in the veil-piercing phase of this case.

 The district judges' orders herein reveal no examination of the objections de-

scribed above. While we acknowledge the great deference we afford district courts in assessing the proper amount of attorneys' fees and costs, *Goodwin,* 973 F.2d at 385, where a party raises specific objections to particular fees or items of cost, we believe it appropriate for the district court, in the first instance, to address such objections and make appropriate factual finding in order that we might arrive at an informed review of the district court's decision. *See Joseph A. by Wolfe v. New Mexico Dep't of Human Servs.,* 28 F.3d 1056, 1060–61 (10th Cir.1994).

## VIII.

We affirm the district court's judgment allowing the plaintiff class to pierce Tru–Tech's corporate veil and recover the damages assessed in the initial litigation from Peacock. While we affirm the district court's decision to allow the plaintiff class to recover the attorneys' fees it incurred in maintaining both the initial litigation and the instant litigation, we vacate the amounts of attorneys' fees and costs assessed by the district court and remand for recalculation consistent with this opinion.

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART.*

its consideration to the "results obtained" in that litigation.