**LOCAL 2–1971 OF PACE INTERNATIONAL UNION; Paper Allied–Industrial, Chemical & Energy Workers International Union, on behalf of members and former member participants in pension plans sponsored by the Defendants; Joy M. O'Dell; Raymon C. Galloway; James F. Sumner; W. Harrison Whitlock; Huey W. Harris; and Gurlie R. Owen, on behalf of themselves and others similarly situated, Plaintiffs,**

**v.**

**Langdon M. COOPER, Trustee in Bankruptcy for RFS Ecusta, Inc., and RFS U.S., Inc.; RFS Ecusta, Inc., as Administrator of the RFS Ecusta, Inc. Hourly Employees' Retirement Plan, and in its own capacity; Directors of**

RFS Ecusta, Inc.; Purico (IOM) Limited; RF & Son, Inc.; RFS U.S., Inc.; Nathu Puri; Steven H. Smith; Trustee of the RFS Ecusta, Inc. Hourly Employees' Retirement Plan; Wachovia Bank, N.A.; and Transamerica Business Capital Corporation, Defendants.

No. CIV.1:02 CV 224.

United States District Court,
W.D. North Carolina,
Asheville Division.

March 24, 2005.

Richard M. Mitchell, Mitchell, Rallings & Tissue, Joyce M. Brooks, Brooks Law Offices, Charlotte, NC, Christian L. Raisner, John Plotz, Van Bourg, Weinberg, Roger & Rosenfeld, Roberta Perkins, Weinberg, Roger & Rosenfeld, Oakland, CA, for Plaintiffs.

Kimberly W. Daniel, Mays & Valentine, D. Eugene Webb, Jr., Vivieon E. Kelley, Troutman Sanders, Richmond, VA, Troutman Sanders, Atlanta, GA, Wyatt S. Stevens, Roberts & Stevens, P.A., Asheville, NC, Thomas G. Collins, Jayson R. Wolfgang, Buchanan Ingersoll Professional Corporation, Harrisburg, PA, Craig D. Mills, Buchanan Ingersoll Professional Corporation, Philadelphia, PA, Kiran H. Mehta, Sara W. Higgins, Kennedy, Covington, Lobdell & Hickman, Pamela Pearson, Charlotte, NC, for Defendants.

### *MEMORANDUM AND ORDER*

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the following matters:

1.  the Second Renewed Motion for Summary Judgment of Defendant Transamerica Business Capital Corporation (Transamerica), filed July 30, 2004;

2.  the Motion for Summary Judgment of Defendants Purico (IOM) Limited, RF & Son, Inc., and Nathu Puri (collectively "Purico") as to Plaintiffs' WARN Act[1] Claims, filed July 30, 2004;

---

1.  Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, et seq.

3. the Plaintiffs' Motion for Partial Summary Judgment and Adjudication as to WARN Act Claims, filed July 30, 2004;

4. the Motion for Summary Judgment of the Purico Defendants and Defendant Steven Smith as to Plaintiffs' ERISA[2] Claims, filed July 30, 2004;

5. Plaintiffs' Motion for Stay of Pension Litigation Pending Merger of Pension Plans and for Vacating of Trial Date as [to] the ERISA Case Only, filed August 13, 2004;

6. the Stipulation and Agreement for Dismissal with Prejudice of Transamerica, filed August 31, 2004;

7. the Plaintiffs' Request for Judicial Notice of a Newly Filed Pleading relevant to Pending Cross Motions for Summary Judgment (WARN Act), filed November 4, 2004;

8. the Motion for Order Striking Answer and Prohibiting Plaintiff[s] from Obtaining Judgment or Alternatively Denying Plaintiff[s'] Motion for Summary Judgment and Adjourning Trial, filed January 21, 2005, by Langdon M. Cooper as Chapter 7 Trustee (Trustee) for the estates of Defendants RFS Ecusta, Inc. and RFS U.S., Inc. (collectively "Ecusta"); and

9. the Motion to Disqualify Troutman Sanders, L.L.P., filed by the Trustee on January 21, 2005.

The Court first notes that, without permission, the parties filed separate motions for summary judgment as to each claim. This is contrary to the custom in this Court and counsel are hereby placed on notice that, in the future, should they appear in this Court, all claims as to which summary judgment is sought are to be pled in one motion subject to the 25 page limit.

## I. PROCEDURAL HISTORY

On September 27, 2002, the Plaintiffs Paper Allied–Industrial, Chemical & Energy Workers International Union (PACE or Plaintiffs), Joy O'Dell, Raymon Galloway, James Sumner, Harrison Whitlock, Huey Harris and Gurlie Owen (Plaintiffs) initiated an action in this Court alleging two violations of ERISA by the Defendants. Complaint, Case No. 1:02cv224, filed September 27, 2002. In response to the motion to dismiss of two of those Defendants, P.H. Glatfelter Company and Mollanvick, Inc., the Plaintiffs moved for leave to amend the complaint, clarifying that the first claim of the complaint against those two Defendants would be dropped, thus mooting the motion to dismiss. Motion with Memorandum in Support, filed December 18, 2002. In the motion to amend, the Plaintiffs also clarified that the action was brought by the Union and named Plaintiffs only for the benefit of the RFS Ecusta, Inc. Hourly and Salaried Employees' Retirement Plans (Plans) and not individually. This eliminated any issue regarding class action status. Plaintiffs further sought leave to add Wachovia Bank, N.A., the Plans' trustee, as a Defendant. That motion was granted by the undersigned on December 30, 2002. Order, filed December 30, 2002. On February 10, 2003, the amended complaint was filed, alleging a single cause of action pursuant to ERISA for breach of fiduciary duty. First Amended Complaint for Declaratory and Injunctive Relief to Rescind Prohibited Transaction and for Breach of Fiduciary Duties Respecting Pension Plan and for Appointment of Independent Fiduciary, filed February 10, 2003.

Meanwhile, on October 4, 2002, Plaintiffs Local 2–971 of Pace International Union and Paper Allied–Industrial, Chemical & Energy Workers International Union,

2. Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, et seq.

AFL–CIO (PACE) initiated a separate action in this Court on behalf of their union members who were employees of RFS Ecusta, Inc., alleging WARN Act violations. Complaint for Damages (WARN Act), in Case No. 1:02cv230, filed October 4, 2002. On July 31, 2003, the undersigned consolidated these cases. Order, filed July 31, 2003.

On November 14, 2002, the Court was advised that the Ecusta Defendants had filed Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the District of Delaware.[3] Notice, filed November 14, 2002. The Plaintiffs thereafter notified the Court they intended to seek relief from the stay in Bankruptcy Court. Notice Concerning Motion for Relief from Stay, filed April 21, 2003. On July 31, 2003, the Plaintiffs advised that on June 24, 2003, U.S. Bankruptcy Court Judge George Hodges had lifted the stay as to the bankrupt Ecusta Defendants. Status Report, filed July 31, 2003. On August 18, 2003, the undersigned was advised that the Ecusta Defendants' bankruptcy case had been converted to a Chapter 7 liquidation and a Trustee had been appointed. Notice, filed August 18, 2003.

On November 20, 2003, the undersigned entered an Order which allowed for the administration of the Plans while this action was pending. No–Contest Order for Interim Administration of Benefit Plans, filed November 20, 2003. That Order continues in effect and thus, the Plans' beneficiaries and participants have been served by the terms and provisions of the Plans despite the bankruptcy of the Ecusta Defendants because the Plans themselves are not bankrupt.

The case proceeded through discovery with a deadline for dispositive motions of July 30, 2004. As a result, the parties

filed cross-motions for summary judgment on that date. However, since the filing of those motions, the parties have also filed miscellaneous motions which the Court will address before reaching the merits of the dispositive motions.

## II. MISCELLANEOUS MOTIONS

### A. Plaintiffs' Motion to Stay

■ On August 13, 2004, while the motions for summary judgment were pending, Plaintiffs moved to stay the ERISA portion of the litigation for six months because negotiations were underway for the merger of the Plans into a larger PACE Industry Union–Management Pension Fund (PIUMPF). Plaintiffs' Motion for Stay of Pension Litigation pending Merger of Pension Plans and for Vacating of Trial Date as [to] the ERISA Case Only, filed August 13, 2004. It was noted that the merger would

> satisfy most of the injunctive relief requested, or make it unnecessary. Specifically, there would be no further need for an independent fiduciary to be appointed; the plan assets will be securely under the control of PIUMPF fiduciaries; and benefits will be guaranteed under established administration of the larger plan. The Court therefore need not decide the merits presented in this case, as it appears that the prayer for relief under ERISA will be largely moot as a result of the merger.

Plaintiffs' Brief in Support of Motion for Stay of Pension Litigation pending Merger of Pension Plans and for Vacating of Trial Date as to the ERISA Case Only, filed August 13, 2004, at 2. The Purico Defendants and Defendant Smith opposed this motion, noting that the Plaintiffs had been

---

**3.** That proceeding was later transferred to the United States Bankruptcy Court for the Western District of North Carolina.

attempting this merger since 2001 and the prosecution of this action had not and would not impact those negotiations. Brief of Purico (IOM) Limited, RF & Son, Inc., Nathu Puri, and Steven H. Smith in Opposition to Plaintiffs' Motion for Stay of Pension Litigation, filed August 26, 2004, at 2. Since the filing of the motion, six months have elapsed and the Court has not received any information from the Plaintiffs suggesting that the merger has been accomplished. As a result, the motion is denied as moot.

## B. The Stipulation to Dismiss

On August 31, 2004, a "Stipulation and Agreement for Dismissal with Prejudice of Transamerica Business Capital Corporation; Order Thereon" was received by the Clerk of Court. The Stipulation has been signed by counsel for the Plaintiffs and Transamerica, but has not been signed by counsel for the other parties. Fed. R.Civ.P. 41(a)(1) (action may be dismissed "by filing a stipulation of dismissal signed by all parties who have appeared in the action"). While the Stipulation contains an ordering paragraph for the signature of the undersigned, it does not appear it was served on the other parties since no certificate of service has been provided. Fed. R.Civ.P. 41(a)(2) ("Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper."). Absent the consent of all parties, the Court will not sign the Order.

## C. Transamerica's Second Renewed Motion for Summary Judgment

On July 30, 2004, Transamerica renewed its motion for summary judgment. Be-

cause the Plaintiffs were under the impression that their stipulation of dismissal would be approved, they never responded to this motion. As a result, the undersigned will not grant the motion; however, Plaintiffs will be provided with an opportunity to move for dismissal of Transamerica on notice to all parties.

## D. The Motion of the Chapter 7 Trustee to Strike Ecusta's Answer

■ On January 21, 2005, the Chapter 7 Trustee moved to strike the answer of the Ecusta Defendants or, in the alternative, to deny the Plaintiffs' pending motion for summary judgment as to the WARN Act claim and adjourn the trial of the action. Since the Court has already moved the trial date of this case from the March 2005 term, that motion to adjourn is moot. The Ecusta Defendants have previously filed response to the Plaintiffs' motion for summary judgment and thus, the Trustee's alternative motion is moot.

The Trustee claims that an answer was filed on behalf of the Ecusta Defendants without his permission and, thus, should be stricken. As previously noted, on June 24, 2003, Bankruptcy Judge Hodges lifted the automatic stay as to the Ecusta Defendants so that the Plaintiffs could prosecute these consolidated actions. Exhibit 1, *attached to* Declaration of John Plotz in Opposition to Defendant Trustee's Motion to Strike Answer (WARN Act), filed February 2, 2005. The Bankruptcy Court did note, however, that the Plaintiffs could not seek entry of default or default judgment in the event the Ecusta Defendants failed to file answers in the lawsuits.[4] *Id.,* at 2. The undersigned was thereafter advised that the parties were at a loss to ascertain

---

**4.** The Chapter 7 Trustee argues that because of this language, no party may seek summary judgment against the Ecusta Defendants in this Court. The reasoning is inapposite. Ob-

viously, the Bankruptcy Court was attempting to protect the Debtors from default during a time when representation in this Court might not have been clear.

whether the law firm of Troutman, Sanders L.L.P. represented the Ecusta Defendants in the ERISA action. Exhibit 2, *attached to* Plotz Declaration. In response, the undersigned noted that the Troutman, Sanders firm had moved for admission *pro hac vice* in the WARN Act case, which admission had been granted, and, in order to avoid a default on the part of the Ecusta Defendants, the undersigned ordered that firm to either file answer on behalf of those Defendants or explain why it did not represent them. Exhibit 3, *attached to* Plotz Declaration. On August 14, 2003, Michael Pratt of Ramsey, Hill, Smart, Ramsey & Pratt, P.A., of Brevard, North Carolina, signed answers on behalf of the Ecusta Defendants in both actions. Exhibit 5, *attached to* Plotz Declaration; Answer, *attached to* Plaintiffs' Motion for Partial Summary Judgment and Adjudication, filed July 30, 2004. The law firm of Troutman Sanders was also listed as counsel for the Ecusta Defendants. *Id.* The Answer in the ERISA case (1:02cv224) was filed only on behalf of the Ecusta Defendants. However, the Answer in the WARN Act case (1:02cv230) was filed on behalf of the Ecusta Defendants as well as the Purico Defendants. The allegations contained in both Answers are in no manner contrary to the interests of the Ecusta Defendants.

In support of the motion to strike the answer, the Trustee alleges

[t]he answer that was purportedly filed on behalf of the Debtors [Ecusta Defendants] was not authorized by the Trustee and consequently is void. As stated above, the answer was filed by Troutman after the Trustee was appointed, without authorization from the Trustee. Troutman was never retained to represent the Trustee and its act of filing an answer on behalf of the Debtors after the Trustee's appointment should not prejudice the Trustee. Accordingly, the Trustee requests that this Court strike the answer.

Motion for Order Striking Answer and Prohibiting Plaintiff[s] from Obtaining Judgment or Alternatively Denying Plaintiff[s'] Motion for Summary Judgment and Adjourning Trial, filed January 21, 2005, at 5–6. In a footnote, the Trustee argues that in the event the undersigned denies this motion, "then the opposition to Plaintiff[s'] Summary Judgment Motion filed by Troutman should be deemed filed on behalf of the Debtors." *Id.*, at n. 3.

It is first noted that this Trustee was appointed on August 13, 2003, yet he has not filed any response on behalf of the Ecusta Defendants to the pending motions for summary judgment. Indeed, at a Bankruptcy Court hearing in October 2003, he represented to that Court that in the ERISA and WARN Act cases pending in this Court, "[c]urrently there is counsel representing me in that, *the Troutman firm* [.]" Exhibit 6, *attached to* Plotz Declaration, at 6. The Trustee's position in January 2005, over a year later, is disingenuous, to say the least.

On August 18, 2003, this Court was first made aware that on August 13, 2003, the Bankruptcy Court had converted the Chapter 11 case to a Chapter 7 liquidation. It was the next day that counsel filed answers on behalf of the Ecusta Defendants and the undersigned cannot find that counsel in any manner trumped any authority which the Chapter 7 Trustee may have had. Moreover, at the time, the Trustee took no action against the answers, made no complaints about them, and later represented to the Bankruptcy Court that these very attorneys were representing the Ecusta Defendants, at least at that point in time.

Moreover, it appears from the exhibits submitted by the Plaintiffs that the Trustee has been involved in the litigation of

this case throughout the period of discovery. *See,* Exhibits 7–16, *attached to* Plotz Declaration. If the Trustee deemed the answers as filed in some manner deficient, he has had two years to move for leave to amend the same. However, he has not done so. The Trustee's motion to strike the answer is denied. While this Court has no authority over the Bankruptcy Court proceedings, it would appear that time expended by the Trustee in connection with this motion was not well spent.

### E. The Motion of the Chapter 7 Trustee to Disqualify Troutman Sanders, L.L.P.

On February 2, 2005, the Trustee moved to disqualify the law firm of Troutman Sanders from representing the Purico Defendants based on a conflict of interest. The Ecusta Defendants filed petitions for bankruptcy in October 2002; in December 2002, the Ecusta Defendants as debtors filed a motion in Bankruptcy Court for leave to retain the Troutman Sanders firm as special labor counsel. No party has elucidated the Court as to the meaning of "special labor counsel" in context of the bankruptcy proceeding.

■ Meanwhile, this action had been commenced by PACE in September 2002 against the Ecusta Defendants as well as the Purico Defendants. In November 2002, the Troutman Sanders firm moved for admission *pro hac vice* in this Court to represent the Purico Defendants. Although the Chapter 7 Trustee makes the conclusory statement that this constitutes a conflict of interest, he does not further define the conflict.

[T]he party moving for disqualification must [first] establish that an attorney-client relationship existed with the alleged former client and second, that the former representation is substantially related to the current controversy. "Disqualification issues must be decided on a case-by-case basis." Because disqualification is a drastic remedy which may not be based on "imagined scenarios of conflict," the moving party has a high standard of proof.

*SuperGuide Corp. v. DirecTV Enter., Inc.,* 141 F.Supp.2d 616, 621 (W.D.N.C.2001), *mandamus denied,* 18 Fed.Appx. 810 (Fed.Cir.2001) (quoting *Plant Genetic Sys., N.V. v. Ciba Seeds,* 933 F.Supp. 514, 516 (M.D.N.C.1996)) (other citations omitted). Without more, the undersigned cannot glean from the motion that the representation provided in the context of a bankruptcy proceeding was "substantially related" to the ERISA and WARN Act cases. *Id.,* at 623 (" 'Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the matters on which [the] firm represent[ed] [the former client so] as to create a realistic risk ... that unfair advantage will be taken of the [former client].' " (quoting *Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746, 749 (2d Cir.1981))).

Moreover, it cannot be overlooked that the Chapter 7 Trustee waited almost two years to complain. " 'It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right.' " *In re Valley–Vulcan Mold Co.,* 5 Fed.Appx. 396, 401 (6th Cir.2001) (quoting *Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85, 87 (9th Cir.1983)). " 'Disqualification is a serious matter which cannot be based on imagined scenarios of conflict, and the moving party has a high standard of proof to meet in order to prove that counsel should be disqualified.' " *In re Charlotte Commercial Group, Inc.,* 2002 WL 1284270 *5 (Bankr. M.D.N.C.2002) (quoting *Plant Genetic Sys., supra,* at 517). In the absence of more than has been presented here, the

Court will not disqualify, especially at this late date, the law firm of Troutman Sanders from representing the Purico Defendants.

Nonetheless, there is an issue concerning whether Gene Webb of that law firm may be called as a witness during the trial of this case. That possibility results from the fact that Webb drafted certain letters upon which the parties rely in connection with the WARN Act claim. In fact, as noted below, Webb provided written legal advice to Ecusta management interpreting one letter drafted by him. As a result, the Court will require the parties to advise the Court of their positions regarding the possibility that Mr. Webb will be called as a witness during the trial.

### III. SUMMARY JUDGMENT STANDARD OF REVIEW

Under the Federal Rules of Civil Procedure, summary judgment shall be awarded "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, ... show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has observed, "this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 519 (4th Cir.2003) (quoting Fed.R.Civ.P. 56(e) and *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994)

(citing *Anderson, supra* ). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." *Bouchat,* 346 F.3d at 522 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. *Id.*

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denial of [its] pleadings," but rather must "set forth specific facts showing that there is a genuine issue for trial." Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

*Id.* (quoting Fed.R.Civ.P. 56(e) and *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987)) (other internal citations omitted). Moreover, in considering the facts for the purposes of this motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When considering cross-motions for summary judgment, as have been pled here, the Court will consider each motion separately using the same standard as set forth above.

## IV. THE MOTION FOR SUMMARY JUDGMENT AS TO THE ISSUE OF A LOCKOUT EXEMPTION PURSUANT TO THE WARN ACT

### A. Findings of Fact

Ecusta was founded in 1939 by Harry Strauss as the Ecusta Paper Corporation, and was the first mill built to manufacture cigarette papers in the U.S. In 1949, Ecusta was sold to Olin Industries, which expanded Ecusta's product line to include plug wrap papers and tipping papers for the tobacco industry, as well as lightweight opaque printing papers for the publishing and printing industry, and other specialty producers. After 36 years, Olin Industries sold Ecusta to a group of its employees in 1985. In 1987, the P.G. Glatfelter Company acquired Ecusta for $225 million .... Since the Glatfelter acquisition, there [was] very little investment in the paper mill. As a result, the Ecusta mill went from the most technically advanced cigarette paper supplier in the late 1980's, to one of the least innovative suppliers by the mid–1990's.

Exhibit 10, *attached to* Declaration of John Plotz in Opposition to Defendants' Motion for Summary Judgment (WARN Act), filed August 13, 2004, at TBC 0007. In August 2001, Glatfelter sold Ecusta to RF & Son, Inc., a subsidiary of Purico, Ltd., formed for the sole purpose of acquiring the Ecusta mill and assets. *Id.,* at TBC 0002, 0008. Purico is a holding company owned "100% by Clary Limited, which in turn is owned by Nathu R. Puri and his family." *Id.,* at TBC 0006. At the time of the acquisition, Ecusta employed 752 hourly workers, all of whom were represented by PACE, as well as 220 salaried employees. *Id.,* at TBC 0007. The collective bargaining agreement with the Union was due to expire on October 1, 2001. *Id.* ·

The collective bargaining agreement between Ecusta and PACE did, in fact, expire on October 1, 2001. Declaration of Robert E. Smith in Support of Plaintiffs' Motion for Partial Summary Judgment and Adjudication, filed July 30, 2004, at 2. A strike thereafter ensued and the parties entered into a Memorandum of Understanding on November 12, 2001, pursuant to which the terms of the expired collective bargaining agreement would be continued during the negotiations for an agreement. *Id.;* Exhibit 1, *attached to* Smith Declaration. The Union agreed to refrain from further strikes and Ecusta agreed to refrain from a lockout of the Union members. *Id.* The Memorandum, however, could be terminated by either party upon 14 days' written notice. *Id.* That termination would mean that the Union and Ecusta no longer had a collective bargaining agreement.

In December 2001, Steven Smith was hired by Ecusta as a consultant. Deposition of Steven H. Smith, *attached to* Declaration of John Plotz in Opposition to Defendants' Motion for Summary Judgment (WARN Act) Transcripts, filed August 13, 2004, at 9. In January 2002, Smith became the chief financial officer for the corporation. *Id.* On June 18, 2002, Smith received an e-mail from Jim McMillan concerning the dire financial straits of the Ecusta plant. Exhibit 1, Plotz Declaration, filed July 30, 2004, at PID0117. Smith responded by e-mail that he would not have time that week for a staff meeting regarding finances due to work being done "on the WARN Act extensions, withdrawals and layoffs ...." *Id.,* at PID0116. He noted that the next meeting with the Union was not until July 18 and 19 and referred to the implementation of layoffs "on the new sides employees." *Id.* On Monday, July 29, 2002, Smith wrote to other management at Ecusta that the details of the package sent to the Union negotiating team had leaked to the general membership. Exhibit 2, *attached to* Plotz Declara-

tion, filed July 30, 2004. "Letters containing the information delivered to the union will be mailed starting Wednesday." *Id.* Smith also wrote that "[w]hen we issue the 14 day notice, I am thinking this Thursday, we will have no cash to run the operations or protect the assets. I think we will have to lock the gates and send everyone home." *Id.* The 14–day notice referenced in these memoranda was the 14–day termination provision in the November 2001 Memorandum of Understanding.

Robert Smith is a vice-president of PACE and was involved with negotiations for the Union at the Ecusta plant. Smith Declaration, *supra,* at 1–2. He had been negotiating with Ecusta management during the period leading up to July 31, 2002, at which time he wrote to Ecusta's attorney, Gene Webb, regarding the Union's desire to continue negotiations. Exhibit 3, *attached to* Plotz Declaration, filed July 30, 2004. On August 1, 2002, Robert Smith received a copy of a letter from Steven Smith, chief financial officer, terminating the November 2001 Memorandum of Understanding and providing 14–days' notice thereof. Exhibit 2, *attached to* Robert Smith Declaration, *supra.*

> In accordance with the Memorandum of Understanding between RFS Ecusta, Inc. and PACE International Union dated November 12, 2001, the Company is hereby providing Local 1971 with written notice of the termination of such agreement fourteen (14) days from today. Also, if the Company's last, best and final offer as conveyed to the Union on July 19, 2002, as corrected on July 26, 2002, is not ratified by the Union as of the end of this fourteen (14) period, *the Company will no longer be able to continue in business.* If the offer is ratified, I cannot tell you how many of the current employees of the Company will continue as active employees, or for how long. *The business is in a very precarious position at this time and management cannot predict what the future will bring to the Company and its employees if we have a new labor agreement.*

*Id.* (emphasis added). On that same date, Ecusta's attorney, who apparently drafted the letter, interpreted the language of that letter for Steven Smith and advised as follows:

> The company and the union have equal right to termination [of] that agreement upon 14 days written notice.... [T]he letter says that if the offer is not ratified, the Company will no longer be able to continue in business. It does not say that employees will be terminated or laid off, or that either of those eventualities will occur at any particular time. It could be read to state that the Company will go out of business on August 16 if the offer is not accepted by August 15, but it doesn't say that. It could mean that we think the union will call a strike on the 16th which would almost surely put [Ecusta] out of business, or it could mean we will lock out employees on that date, neither of which requires a WARN notice. The language is purposefully ambiguous. In short, we have decided nothing that would require a [WARN] notice at this time, in part, because it depends on what the union does in reaction to the notice of today.

Exhibit 3, *attached to* Plotz Declaration, filed July 30, 2004.

On August 2, 2002, Angela Elliott, who served as the secretary for PACE at Ecusta, attended a meeting with Steven Smith as well as with Jerry Stuart, Larry Owenby and Harold Huffman, who were PACE representatives. Declaration of Angela G. Elliott in Support of Plaintiffs' Motion for Partial Summary Judgment and Adjudication, filed July 30, 2004, at 2–3. Her contemporaneous notes of the meeting indicate that Smith advised management was

preparing for a Chapter 11 bankruptcy reorganization. Exhibit A, *attached to* Elliott Declaration. Huffman asked Smith whether ratification of the company's last offer would guarantee that the employees could go back to work. *Id.* According to Elliott's notes, Smith replied:

> No guarantee—fact tomorrow had order we do not [have] money to buy raw materials to fill orders.
>
> H[uffman:] Are you saying this is a lock out or lay-[off]
>
> Steve[:] Truthfully—a lay-off—because of business condition, out of business have to check with Gene Webb but in my opinion this would be lay-off.

*Id.* When Elliott later received her notice of termination, the notice stated that she had been placed "on lay-off status effective Monday, August 19, 2002." Exhibit B, *attached to* Elliott Declaration. Other employees received notices signed by the personnel manager at Ecusta which provided that they were terminated due to lack of work. Exhibits C, D, and E, *attached to* Elliott Declaration.

By August 12, 2002, Ecusta's attorney clarified the meaning of the 14–day notice *via* e-mail to Robert Smith in which he advised that "[t]he Company is in the process of closing down the operation and will lock out all employees represented by the Union as of 12:01 AM this Friday, August 16, pending ratification of its last proposal which was made in the Company's last, best and final offer." Exhibit 3, *attached to* Robert Smith Declaration. On August 13, 2002, the local PACE representative was provided a letter from Steven Smith advising that

> [o]n August 1, 2002, you were hand delivered a letter giving 14 days' notice of the termination of the Memorandum of Understanding between RFS Ecusta, Inc. and Pace International Union Local No. 2 1971 dated November 12, 2001.

Having been given the 14–day notice of termination, you are hereby notified that, effective 12:01 AM on August 16th, 2002, RFS Ecusta Inc. will lock out all hourly employees represented by Pace Local No 2–1971, pending the approval of the Company's last, best and final offer as previously conveyed to the Union.

*Id.*

Steven Smith testified at his deposition that if the Union members had signed the last proposed contract, Ecusta's chances of obtaining additional funding to keep the plant in business "definitely would have been improved and I believe we could have obtained funding elsewhere." Exhibit 6, *attached to* Plotz Declaration, filed July 30, 2004, at 70. According to Smith, the purpose of sending out the notice was to bring the union back to the negotiating table. *Id.*, at 71. Smith also testified that the company made a decision to pursue the lockout mechanism in order to insure an orderly shutdown of the plant, to persuade the union to ratify the contract, and to avoid having to pay 60 days of pay for every employee not provided with 60 days' notice under the WARN Act. *Id.*, at 75.

Smith's testimony was reiterated by a contemporaneous e-mail from Ecusta's attorney, Gene Webb to Smith on August 27, 2002.

> I must confess that I tend to be somewhat of a purist and I know the value of truth. Some truths are elusive, but here there is a very strong, written record of the fact that we locked out the bargaining unit employees. It has been in the paper, written in letters, posted at the gates of the plant, and probably would be established in a hundred other ways. We deliberately chose the path of lockout as (a) a defensive measure to allow an orderly shut down of the plant, (b) an offensive measure to hammer the union

into submission, and (c) as a strategy to avoid 60 days' pay for each and every bargaining unit employee who was shut out from work without 60 days advance notice. I think it would be dishonest NOW to say we really didn't lock everyone out but that we just laid everyone off, in direct violation of WARN, because we couldn't meet the payroll.

Exhibit 8, *attached to* Plotz Declaration, filed July 30, 2004.

## B. Discussion

PACE brought an action against the Ecusta Defendants, the Purico Defendants and Transamerica for failing to provide 60 days' notice to its union members who were Ecusta employees prior to the termination of those employees at the Ecusta Mill in Pisgah Forest, near Asheville, North Carolina. The failure to do so, PACE alleges, violated the WARN Act.

The parties admit that no notice was provided to the Ecusta employees and that the plant closed on August 16, 2002. They dispute whether the closing was a mass layoff, plant closing or lockout due to the lapse of a collective bargaining agreement.

The purpose of the WARN Act is to provide:

> protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

Employers with 100 or more full-time employees are barred from ordering a plant closing or mass layoff "until the end of a 60–day period after the employer serves written notice of such an order to each representative of the affected employees as of the time of the notice ...."

*Childress v. Darby Lumber, Inc.,* 357 F.3d 1000, 1005 (9th Cir.2004) (quoting 20 C.F.R. § 639.1; 29 U.S.C. §§ 2101(a), 2102(a)(1)). "A principal enforcement mechanism of the Act permits employees to seek damages from their employer in federal court in an amount equivalent to sixty days' pay and fringe benefits when the employer fails to give proper notice ...." *Vogt v. Greenmarine Holding, L.L.C.,* 318 F.Supp.2d 136, 140 (S.D.N.Y. 2004) (citing 29 U.S.C. § 2104(a)).

Here, the Plaintiffs have moved for summary judgment claiming that the management merely contrived the lockout at a time when there was no work available at the plant in order to avoid WARN Act liability. The Defendants have responded that they did, in fact, explicitly choose the lockout mechanism for three reasons, one of which included avoiding WARN Act liability.

The WARN Act provides that the notification requirements are not applicable when the closing or lay-off "constitutes a lockout not intended to evade the requirements of this [Act]." 29 U.S.C. § 2103(2). Both Steven Smith and Webb acknowledged that one reason for the 14–day notice terminating the Memorandum of Understanding was to avoid complying with the WARN Act.

A lockout occurs when, for tactical or defensive reasons during the course of collective bargaining or during a labor dispute, an employer lawfully refuses to utilize some or all of its employees for the performance of available work.... A plant closing ... where a ... lockout is taking place, which occurs for reasons unrelated to a ... lockout, is not covered by this exemption.

20 C.F.R. § 639.5(d). Thus, Ecusta clearly had the right to terminate the Memorandum of Understanding and thus, to place a lockout into effect "for tactical or defensive reasons" while negotiating for the collective bargaining agreement. However, the letter sent to the Union contained the proviso that the "Company will no longer be able to continue in business" unless the last offer were to be accepted. Such language sounds more like a "plant closing" which is clearly covered by the Act. 20 C.F.R. § 639.3(b) ("The term 'plant closing' means the permanent or temporary shutdown of a 'single site of employment' ... if the shutdown results in an 'employment loss' during *any 30 day period* at the single site of employment for *50 or more* employees. An employment action that results in the effective cessation of production or the work performed by a unit, even if a few employees remain, is a shutdown."). This is reiterated by the remaining language in the letter warning the Union that even if the last offer is accepted, management could not insure continued employment. "If the offer is ratified, I cannot tell you how many of the current employees of the Company will continue as active employees, or for how long." Thus, it is possible that the lockout occurred because there was no more work available, a situation which would not be exempted from the notification requirements. As noted above, the evidence presented supports each position and the undersigned cannot find that either party has proved there are no genuine issues of material fact. Indeed, the issue appears to be one of credibility as to which the Court may not render decision on summary judgment.

## V. THE MOTION FOR SUMMARY JUDGMENT AS TO EMPLOYER STATUS UNDER THE WARN ACT

### A. Findings of Fact

The Plaintiffs did not seek summary judgment on the question of whether the Purico Defendants were employers under the WARN Act. The Defendants, however, moved for summary judgment as to that issue.

The parties do not dispute that RFS Ecusta, Inc., is a wholly owned subsidiary of co-Defendant RF & Son, Inc. Nor do they dispute that the sole shareholder of RF & Son Inc., is Purico Ltd. (Purico) which is wholly owned by Clary, Ltd. Deposition of Nathu R. Puri, *attached to* Declaration of John Plotz in Opposition to Defendants' Motion for Summary Judgment (WARN Act)-Transcripts, filed August 13, 2004, at 16–17. And, Nathu Puri (Puri) owns 84 percent of Clary. *Id.,* at 11.

In October 2001, Puri wrote a letter to the editor of the *Transylvania Times,* a newspaper published in the area where the Ecusta plant operated. Exhibit A, *attached to* Declaration of Angela G. Elliott in Opposition to Defendants' Motion for Summary Judgment (WARN Act), filed August 13, 2004.

This summer, *I purchased Ecusta Mill and formulated a plan for modernizing* that facility so that it could compete successfully with domestic and over-seas manufacturers of cigarette papers and other paper interests.

\*    \*    \*    \*    \*    \*

As a result of Ecusta's very poor business performance over the last 3 years, the financial institution that *lent us the money to buy the mill* is not willing to advance substantial further funds to purchase new equipment without wage concessions by the workforce.

\*    \*    \*    \*    \*    \*

[During labor negotiations,] [t]he Company also explained [to the union] that *additional investments would be made with funds provided by me* and hopeful-

ly by the financial institutions that had *loaned me money to buy the plant.*

\* \* \* \* \* \*

In fact, the union successfully urged its members to boycott a presentation that David Poor, the Mill Manager, made describing in detail the plant's financial condition, how that situation had developed, *and my plans for investment in new equipment.* The Company offered the union a profit-sharing plan that would have enabled the employees to recoup their wage cuts *if the plant met what I perceived to be an achievable level of profitability.*

\* \* \* \* \* \*

Last week, the union rejected the Company's contract offer and voted to go on strike ... despite ... *recent efforts by me to attract new business from prospective customers, such as Philip Morris and RJR.*

\* \* \* \* \* \*

The simple fact remains, however, that *I found the plant in a condition that required immediate significant measures to remedy the affect of years of lack of investment, which are necessary to keep pace with technological improvements.... I have written this letter because I wanted the community to understand that my plans were well-intended and based on what I felt had to be done to save the plant from a slow, but certain, demise. I also wanted everyone to understand the good faith efforts that I had made to work with the union to avoid that end.*

*Id.* (emphasis added). The letter was signed "Nathu R. Puri, RFS Ecusta, Inc." *Id.*

On January 8, 2002, Puri sent a letter to "Member[s] of the Transylvania County Community" which he signed as "Chairman and Owner" of the mill. Exhibit B, *attached to* Elliott Declaration. In that letter, Puri noted that he had personally

taken the following proactive steps related to the Ecusta plant: (1) a meeting with community leaders in the county to educate them about "breaking developments with Ecusta;" (2) requests that community members individually encourage union members to enter into a contract; (3) a statement to dispel "speculation about whether I plan to sell the company, just a few short months after buying it;" (4) an acknowledgment he had already received, and rejected, an offer for the company; (5) "Our focus must be on creating a successful company under current ownership[;]" (6) "Now, we risk losing our largest remaining customer on the cigarette paper side[;]" (7) an assurance that based on his personal relationship with that customer, an extension had been given; (8) a statement of the business problems which "we face today[;]" (9) "I will do everything I can to keep the mill open". I have built my career on turning around troubled companies in many different types of industries[;] (10) "[W]e signed a $10 million order for new equipment last month, and I am prepared to invest further in R & D and other resources"[;] (11) and Puri's offer to continue negotiations with the federal mediator to obtain a collective bargaining agreement. *Id.*

Puri also testified that he personally spoke with and went to see Robert Smith, the Union representative at Ecusta. Puri Deposition, *supra*, at 112. Puri later met with Smith and the federal mediator. *Id.* He thought they had reached an agreement; however, he began to receive death threats *via* e-mail. *Id.*, at 113. Puri attended a third meeting in Los Angeles in an attempt to reach an agreement with the Union. *Id.*, at 114.

Steven Smith, the chief financial officer of Ecusta, testified during his deposition that he discussed the 14-day termination notice, the lockout and WARN Act re-

quirements with Puri. Deposition of Steven Smith, *attached to* Plotz Declaration–Transcripts, filed August 13, 2004, at 233. A collective decision was made to send the 14–day notice, a decision made by Smith, Puri, Webb and the executive staff. Smith Deposition, Vol. II, at 62. Smith was also present during a meeting with Puri and bank officials at which time the financial status of Ecusta was discussed. *Id.*, at 8. In order to reassure the bank, Puri pointed out that the pension fund was overfunded by $10 million. *Id.*, at 9. Smith testified that Ecusta paid royalties to RF & Son for the use of intellectual property. *Id.*, at 35. Although the royalties were to be paid quarterly, Smith could only recall one payment. *Id.* Smith also testified that he was in consistent contact with Puri about the day-to-day operations of the plant. *Id.*, at 81–83. Sometimes Smith was able to change Puri's mind about a business decision; other times, Smith was obligated to acquiesce to Puri. *Id.* Smith could not recall an occasion during his tenure at Ecusta when he refused to follow a directive from Puri. *Id.* Smith testified that he had discussions throughout his time at Ecusta with Puri who was integrally involved in the decision to issue the 14–day notice and effect a lockout. *Id.*, at 84. Smith considered Puri to be his boss. *Id.*

In contrast to this deposition testimony, Smith provided an affidavit in support of the Defendants' motion for summary judgment in which he stated:

At the time the lock-out was implemented in August 2002, Ecusta was a wholly-owned subsidiary of RF & Son, Inc., which, in turn, was a wholly-owned subsidiary of Purico U.S., Inc., which was, in turn, owned by Purico (IOM) Limited, a corporation incorporated in the Isle of Man. Purico (IOM) Limited was owned by Clary Limited. After approximately January 2002, [ ] there was no exchange of management between Ecusta and any of these companies, and Ecusta was managed and operated by the senior management team, of which I was the senior member, that worked at the Ecusta Mill.

Exhibit B, Declaration of Steven H. Smith, *attached to* Brief of Purico in support of Motion for Summary Judgment on Plaintiffs' WARN Act Claims, filed July 30, 2004, at 7.

Robert Smith, the PACE representative, was introduced to Puri when he first purchased Ecusta. Deposition of Robert Smith, *attached to* Plotz Declaration–Transcripts, filed August 13, 2004, at 23. Puri identified himself as the new owner of the plant. *Id.* Smith met with Puri more than once in connection with the 2001 strike and thereafter with agents of Puri. *Id.*, at 23–24, 55. No decisions of importance were made about the plant without Puri's involvement. *Id.*, at 55–56. He was told repeatedly by management at Ecusta that nothing could be finalized concerning labor negotiations without approval by Puri. *Id.*

Puri, who could not recall the corporate structure of various entities during his deposition, has averred (1) he is the majority shareholder of Clary Limited; (2) Purico (IOM) Limited was a subsidiary of Clary; (3) Purico U.S., Inc. was a subsidiary of Purico (IOM); (4) RF & Son was a subsidiary of Purico U.S. and (5) RF & Son owned Ecusta. Exhibit A, Declaration of Nathu Puri, *attached to* Brief of Purico in support of Motion for Summary Judgment on Plaintiffs' WARN Act Claims, filed July 30, 2004, ¶¶ 2–6. During the acquisition of the Ecusta plant, he was the vice president and a director of Ecusta and RFS U.S. *Id.*, ¶ 7. After January 2002, he no longer served in such capacities. *Id.* He did, however, sign the loan documents with Transamerica. *Id.*, ¶ 23. Puri also averred that he "was not involved in the lockout, and made no decisions about whether to initiate the lockout. Rather,

although I was informed of the lockout and agreed with the strategy, the decision itself was made by local management at Ecusta." *Id.*, ¶ 34.

On June 26, 2001, Puri was listed as the chief executive officer of Ecusta on an application filed with the North Carolina Department of the Secretary of State. Exhibit 6, *attached to* Plotz Declaration, filed August 13, 2004. On August 9, 2001, he signed the loan and security agreement with Transamerica as the vice president of Ecusta. *Id.*, at Exhibit 7. The transcript of a labor negotiation meeting presided over by a federal mediator on January 15, 2002,[5] lists Puri as the owner of Ecusta. *Id.*, at Exhibit 8. Puri participated extensively in the mediation and represented that he had personally been attempting to obtain business for the Ecusta plant. *Id.* After the lockout notice was sent, Transamerica directly contacted Puri for information concerning insurance coverage, security costs and a detailed plan addressing the liquidity of Ecusta. *Id.*, at Exhibit 12.

In January 2002, a report of the meeting to retain a significant customer was made on Purico letterhead. *Id.*, at Exhibit 14. While Nathu Puri as well as Upendra Puri attended the meeting in London, copies were sent to Ecusta personnel, including Steven Smith. *Id.* In June 2002, Puri attended another meeting in Geneva, again reported on Purico letterhead, and copied to Ecusta personnel. *Id.*, at Exhibit 15. In that report, the customer

> wanted to have an up-date about the current situation with the tobacco paper sites of the Purico Group, especially relative to RFS Ecusta Inc. Mr. Puri submitted the following informations:
>
> The tipping conversion operation at Ecusta will be closed down.... [H]e explained in detail that the current temporary labour (sic) agreement will

be cancelled July 11/12 with 14 days notice. On July 18/19 there will be meeting with the Unions in order to negotiate a new labour (sic) settlement for which the Unions will get Ecusta Management's proposal in June.... [Puri] explained [to] the customer that this further standstill will not last more than 2 to 3 months because during such a period new people will be hired under the new labour (sic) conditions to re-start the tobacco paper production in Pisgah Forest.

*Id.* Likewise, on July 12, 2002 another report on Purico letterhead contained extensive information about Puri's presentation to a customer of the situation at Ecusta. *Id.*, at Exhibit 16. Ecusta was thus referred to, at least to customers, as being a member of the "Purico Group" when Puri attempted to reassure customers. The record is replete with communications among various corporate entities within that "Group." *Id.*

Steven Smith ultimately contacted a friend and advisor of Puri to assist in "bringing Nat [Puri] to deal with reality." *Id.*, at Exhibit 17, at PID0190. Smith reported that during labor negotiations, Puri had used the same labor law firm, Dechert, that he had used for one of his other corporations. *Id.*, at PID0192. "Management was reporting to Nat's nephew, who would not make any decisions, would not listen to management and only followed Nat's orders. *He constantly referred to himself [ ] as puppet of a rich uncle." Id.* (emphasis added).

On June 27, 2002, Smith sent an e-mail to Puri advising that he needed to understand certain funding mechanisms among the various corporate entities, including a detail "on the $5,700,000 that flowed to Ecusta Fibres, Germany and Australia" and "a description of Purico LTD, Purico

---

**5.** The date stated on the transcript is 2001; however, that is clearly an error.

IOM, and Clary LTD." *Id.*, at Exhibit 20. Puri responded

Flow of funds was as follows:

1) Purico Inc. are funded Purico IOM Limited with $7.5 million made up of 500,000 in equity and $7,000,000 in loans.

2) Purico provide RF & Son Inc. with $500,000 in equity and $7.0 million of loan stock.

3) Rf & Son Fund RFS (US) Inc and RFS Ecusta Inc

4) NRP [Puri] provides $2.0 million loan to RFS Ecusta Inc.

5) RfS(US) Inc loans $5.7 million to RF & Son who passes it on to Purico Inc

6) Purico pays back $5.7 million off the loan it received from Purico IOM who use these moneys to pay for the Non U.S. companies.

7) RFS Ecusta pays off 2.0 million [pound] loan from NRP.

*Id.*, at NP0317.

In May 2002, a frustrated Steven Smith wrote to Puri:

Now [I] am down here in North Carolina under the most unusual and stressful of situations, but up to today I was enjoying the challenges, but if you are going to second guess and for the pas[t] three months tell me w[hat] to say and do it will not be a job that I will want to continue on with. I have the roles of CFO, negotiation coordinator, PR, we have no CEO so I have to cover for that administrative function.

*Id.*, at Exhibit 25.

On May 16, 2002, Smith provided the following information to Deloitte & Touche, LLP in the form of a "Client Acceptance Information" sheet: (1) no chief operating officer had been approved "for any of the Purico US, Inc and its subsidiaries;" (2) Upendra Puri was the only director and chairman; (3) Steven Smith was the chief financial and operating

officer; (4) in explaining the corporate organization, Smith noted that "[b]asically in the end all is owned or controlled by Nathu R. Puri." *Id.*, at Exhibit 37, at PID0266–68.

When Smith needed money in June 2002 to continue day-to-day operations, he contacted Puri directly. "I need cash from somewhere: 1) Can you cover the $1,877,838 from the UK?" *Id.*, at Exhibit 42. Puri used his other organizations to loan money and to make royalty payments "due from RFS Ecusta to RF & Sons." *Id.*, at Exhibit 43. On July 2, 2002, Smith wrote to Puri as follows:

Nat: I understand you[r] flow of funds unfortunately it does not match the legal documents that I was presented by Dechert. There is no documentation that I have that mentions any loans at all. Also I had the understanding from the first day I was here that your (Purico IOM LTD) investment was $6,500,000 in equity and $1,000,000 in expenses for a total equity investment in Purico U.S. et al of $7,500,000. If you are now telling me that $5,700,000 was a loan from and back to Purico IOM LTD [it] seems to me your (Purico IOM, LTD) equity investment is only $1,800,000.

*Id.*, at Exhibit 48. On July 3, 2002, Smith advised Gene Webb that he was convinced that Puri's "course of action will only end up shutting the place down." *Id.*, at Exhibit 56. "[W]e are stuck with Nat's road to suicide." *Id.* On July 12, 2002, Smith wrote to Puri about Puri's stated interest in selling Ecusta to management. *Id.*, at Exhibit 57. Smith advised Puri that the company needed to send out a WARN Act notice immediately. *Id.*, at NP0248. On July 23, 2002, Steven Smith wrote to Jim McMillan and Jim Manning at Ecusta as follows:

Funding of Purico US, Inc., et al Per Nathu R. Puri—This flow of funding is

not documented in either the acquisition or loan agreement. Resolution dated as of 8/9/01 and promissory notes as of 8/9/01 will have to be drawn up 6.75% by Dechert. Also the loan documents will have to be researched and these transactions will have to be communicated to TABCC as NR Puri equity investment has greatly been altered.

*Id.*, at Exhibit 47. Attachments to this document show a financial interchange among Purico IOM, Purico US, RF & Son, RFS U.S. and Ecusta. *Id.*

Upendra Puri, Nathu Puri's nephew, has averred that while he is "currently" a director of RF & Son, that entity "exercised no control over RFS Ecusta, Inc., other than the basic oversight that any parent/holding company would exercise over its subsidiaries." Exhibit D, Declaration of Upendra Puri, *attached to* Brief of Purico in support of Motion for Summary Judgment on Plaintiffs' WARN Act Claims, filed July 30, 2004, ¶¶ 2, 4. Anil Puri, another relative of Nathu Puri, has averred that he is "currently" a director of Purico (IOM), Ltd., which is the great-grandparent company of Ecusta but which never exercised any control over that company. Exhibit C, Declaration of Anil Puri, *attached to* Brief of Purico in support of Motion for Summary Judgment on Plaintiffs' WARN Act Claims, filed July 30, 2004, ¶¶ 2, 3, 6.

**B. Discussion**

■ Defendants RF & Son, Purico (IOM) and Puri have moved for summary judgment claiming that neither corporate entity is an employer and Puri, as an individual, cannot be held liable as an employer. In determining whether the Defendants were "employers," the Court considers the factors provided by the WARN Act regulations:

[S]ubsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent or contracting company depending upon the degree of their independence from the parent. Some of the factors to be considered in making this determination are (i) common ownership, (ii) common directors and/or officers, (iii) *de facto* exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations.

20 C.F.R. §§ 639.2, 639.3; *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 489–90 (3d Cir.2001) (applying the Department of Labor [DOL] regulations "has the virtue of simplicity ... [and] allows for the creation of a uniform standard of liability for the enforcement of a federal statute.... [M]ost importantly, the DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind and, unlike traditional veil-piercing and some of the other theories, focus particularly on circumstances relevant to labor relations." (internal citations omitted)).

The sole shareholder of Ecusta was RF & Son. The sole shareholder of RF & Son was Purico, US. The sole shareholder of Purico, U.S. was Purico (IOM). The sole shareholder of Purico (IOM) was Clary, Ltd., 84 percent of which was owned by Nathu Puri. Puri took great care to disassociate himself technically from any or all of the so-called "Purico Group." However, Puri was the driving force behind each of these organizations and, when it was to his advantage, financial interchanges among the organizations occurred with frequency and complexity. But there is no doubt that Puri owned and controlled each of these organizations regardless of the other corporate formalities observed.

Common ownership is the least important factor, and the remaining three factors are guideposts only. Single em-

ployer status ultimately depends on all the circumstances of the case and is characterized as an absence of an arms length relationship found among unintegrated companies.... While technical common ownership is avoided by corporate formalities, this actual commonality of ownership satisfies this "least important factor."

*Childress*, 357 F.3d at 1005–06. "The corporate family tree described by [the Defendants], once the branches are untangled, reveals that only [one] defendant[ ]" actually owns the various corporate entities, Nathu Puri. *Vogt*, 318 F.Supp.2d at 142.

While Purico (IOM), RF & Son and Ecusta may not have shared Nathu Puri as a director or officer, no doubt by clear design, RF & Son and Ecusta did share officers and directors, including Upendra Puri, Steven Smith, and Ajay Badhwar. Nathu Puri maintained almost complete control over the operations Ecusta. He published an open letter to the community reporting his intentions as to the plant, referring to himself as the owner of Ecusta, maintaining he intended to have "hands on" involvement, and recounting his plans to resurrect the plant and infuse money into equipment. Corporate records on Purico letterhead show that Puri went to London and Geneva himself to solicit customers. During a meeting with Puri and the bank, Smith described Puri as involved with the day-to-day operation of the plant. Puri was, as Smith acknowledged, ultimately his boss. *Childress, supra.* (Management would "ultimately answer" to higher management.). Puri was actively involved in the federal mediation over the labor dispute, as recounted in the minutes of the federal mediator. During meetings with customers in Europe, Puri actually forecasted the lockout at Ecusta and advised of his plans for dealing with that situation. Ecusta was described in such meetings as being part of the "Purico

Group." Upendra Puri, the nephew selected to "run" Ecusta, confided to Steven Smith that he was just the puppet of his rich uncle. *Id.* And, Puri had no qualms about restructuring the financial arrangements among his various companies, to the point that Steven Smith was required to have legal staff correct such arrangements after the fact. *Pearson*, 247 F.3d at 494 ("financial control will suffice"). Smith complained that Puri second-guessed every decision he made and constantly told him what to do. When trying to explain Puri's most recent description of the interflow of funds among the companies, Smith told the accountant that "in the end" Puri owned and controlled every single Purico entity, including Ecusta. *In re Shelby Yarn Co.*, 306 B.R. 523, 538 (W.D.N.C. 2004). As the ship was "going down," Smith went to Puri for an infusion of money. Indeed, it appears that the various entities of the Purico Group existed solely to avoid common ownership despite Puri's exclusive control. The Court finds that there was *de facto* control by Puri of each of the corporate entities. While there may not have been a dependency of personnel policies or operations, there was certainly a financial dependency. Summary judgment is inappropriate on this record.

Puri has moved for summary judgment arguing that under the WARN Act, an individual does not qualify as an employer and the alter ego theory does not apply to him. While corporations function as distinct legal entities from the individuals who own them, where the individual is actually the alter ego of the corporation, the corporate veil may, in certain circumstances, be pierced, including in WARN Act cases.

> [T]he federal standard for when it is proper to pierce the corporate veil is notably imprecise and fact-intensive. Federal courts are not bound by the strict standards of the common law alter

ego doctrine which would apply in a tort or contract action. Nor is there any litmus test in the federal courts governing when to disregard corporate form. Instead, the rule in federal cases is founded "only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity." . . . Given the need to consider the purposes of the federal statute, [courts] have crafted what [they] termed a "less rigorous" veil-piercing standard tailored to [WARN Act] cases in order the fulfill that statute's goals.

*Bhd. of Locomotive Engineers v. Springfield Terminal Ry. Co.,* 210 F.3d 18, 26–27 (1st Cir.2000) (internal quotations and citations omitted).

While this circuit has never articulated the federal common law standard for piercing the corporate veil between an individual and a corporation, the Tenth Circuit has applied a two-prong test: "(i) was there such unity of interest and lack of respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (ii) would adherence to the corporate fiction sanction a fraud, promote injustice, or lead to an evasion of legal obligations."

*Minnesota Laborers Health and Welfare Fund v. Scanlan,* 360 F.3d 925, 928 (8th Cir.2004) (quoting *NLRB v. Greater Kan. City Roofing,* 2 F.3d 1047, 1052 (10th Cir. 1993)); *Thomas v. Peacock,* 39 F.3d 493, 503 (4th Cir.1994), *rev'd on other grounds,* 516 U.S. 349, 353–54, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996) ("Because a rule of veil-piercing determines *who* is liable for breaches of ERISA fiduciary duties, we believe that ERISA preempts any state law of veil-piercing" and adopting the Tenth Circuit test set out above.); *accord, United States v. Pena,* 731 F.2d 8, 12 (D.C.Cir.1984); *Flynn v. Greg Anthony*

*Constr. Co., Inc.,* 95 Fed.Appx. 726, 732–33 (6th Cir.2003) ("Consistent with the trend of federal courts to apply federal common law for assessing alter-ego liability in ERISA actions and with the D.C. Circuit's determination that courts should resort to the federal common law on piercing the corporate veil when a federal interest is implicated, it was proper for the D.C. District Court to evaluate Defendants' motion to dismiss . . . using the . . . federal common law with respect to piercing the corporate veil and alter-ego liability." (internal citations omitted)). On the record before the Court, summary judgment is not appropriate.

## VI. THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' ERISA CLAIMS

### A. Findings of Fact

Nathu Puri, Steven Smith, Purico (IOM) and RF & Son move for summary judgment claiming that they are not fiduciaries, whether named or *de facto* of the Ecusta Plan. Assuming *arguendo* that they were fiduciaries, they argue that there was no prohibited transaction or breach of any duty of care. They also claim that because they had no knowledge of prohibited transactions, they may not be held liable as nonfiduciary parties in interest.

It is not disputed that in August 2001, Purico (IOM), RF & Son, RFS U.S. and RFS Ecusta entered into an Acquisition Agreement with P.H. Glatfelter Company pursuant to which the four corporate entities purchased the Ecusta plant. Under the terms of the Acquisition Agreement, Ecusta was to operate the plant while RFS U.S. would own the plant and its equipment. Exhibit A, Declaration of Nathu Puri, *attached to* Defendants' Motion for Summary Judgment on Plaintiffs' ERISA Claims, filed July 30, 2004, ¶¶ 9, 14. The Agreement also provided that all Glatfelter

employees would become Ecusta employees, the collective bargaining agreement with PACE would continue and pension plans for both salaried and hourly employees would be established. *Id.*, ¶¶ 13, 15. In accordance with the Agreement, Glatfelter transferred assets to the plans in an amount greater than required to fund the plans, thus creating a surplus in the plans in the amount of $10 million. *Id.*, ¶ 18.

On the same date that the Agreement was entered into among the entities, Ecusta and RFS U.S. entered into a loan agreement with Transamerica. *Id.*, ¶ 22. Puri signed the loan agreement pursuant to which Transamerica agreed to extend credit to Ecusta in an amount not to exceed $40 million. *Id.*, ¶ 24.

In a letter from Steven Smith to the union representative in May 2002, Smith described the over funded pension plans as having been encumbered by the bank. Exhibit D, *attached to* Declaration of John Plotz in Opposition to Defendants' Motion for Summary Judgment (ERISA), filed August 13, 2004, at 7. In another letter in May 2002, Smith represented to Transamerica that its loans were secured by the excess pension fund. Exhibit F, *attached to* Plotz Declaration–ERISA, at 3.

Howard Handman worked for Transamerica at the time and testified that Puri explained to him that "he had an over funded pension plan" in the context of representing it as additional collateral to secure the loan. Deposition of Howard Handman, *attached to* Plotz Declaration–ERISA–Transcripts, filed August 13, 2004, at 119.

The Court also relies on the other findings of fact recited *infra* in ruling on this motion.

## B. Discussion

ERISA is designed to "protect ... the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans." To this end, Congress has mandated that private pension plan assets are to be held in trust for the exclusive benefit of plan participants and beneficiaries. Moreover, the authority to administer the plan must be vested in one or more named fiduciaries. The fiduciary need not be an independent party; the employer or plan sponsor may appoint its own "officer, employee, agent, or other representative" to serve in a fiduciary capacity. Section 1104(a)(1) of ERISA imposes three general duties on pension plan fiduciaries. ERISA fiduciaries must 1) discharge their duties with "prudence;" 2) diversify investments to "minimize the risk of large losses;" and 3) act "solely in the interest of the participants" and for the "exclusive purpose" of providing benefits to those participants. ERISA also expressly prohibits certain transactions where the potential for abuse is particularly acute.

.    .    .    .    .

ERISA provides that a fiduciary of a plan shall not cause the plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect ... lending of money or other extension of credit between the plan and a party in interest ... [or] transfer to, or use by or for the benefit of a party in interest, of any assets of the plan[.] Similarly, a plan fiduciary shall not "deal with the assets of the plan in his own interest or for his own account."

*Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1093–94, 1100 (9th Cir.2004) (quoting 29 U.S.C. §§ 1001(b), 1108(c)(3), 1104(a)(1), 1106(b)(1)) (other citations omitted).

The parties do not dispute that the Transamerica line of credit was secured by the over funded portion of the pension plan. "Corporations should not be permitted to rely on their ERISA plan assets to finance takeovers or other risk ventures." *Kayes v. Pacific Lumber Co.,* 51 F.3d 1449, 1468 (9th Cir.1995). Use of residual plan surplus as collateral to finance a corporate purchase is a prohibited transaction. *Id.* Instead of arguing that the arrangement was legal, the Defendants argue that none of them is a fiduciary under the Plan. However, the ERISA complaint seeks equitable relief; thus, regardless of their fiduciary status, the Defendants may be subject to those remedies. *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000); *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough,* 354 F.3d 348, 352–53 (5th Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 2412, 158 L.Ed.2d 981 (2004); *Carlson v. Principal Financial Group,* 320 F.3d 301, 308 (2d Cir.2003); *LeBlanc v. Cahill,* 153 F.3d 134 (4th Cir.1998).

Defendants also claim they had no knowledge that this arrangement constituted a prohibited transaction. Nathu Puri signed the agreement with Transamerica and later represented to that entity that he had additional collateral in the form of the over funded pension plan. Steven Smith wrote letters referring to the arrangement. And, as previously noted, at least for purposes of summary judgment, Purico and RF & Son were merely the alter egos of Puri. The undersigned cannot find on this record that the Defendants are entitled to summary judgment.

## VII. ORDER

**IT IS, THEREFORE, ORDERED** as follows:

1. the Second Renewed Motion for Summary Judgment of Defendant Transamerica, filed July 30, 2004, is hereby **DENIED;**

2. the Stipulation and Agreement for Dismissal with Prejudice of Transamerica Business Capital Corporation, filed August 31, 2004, is hereby **STRICKEN** without prejudice;

3. the Motion for Summary Judgment of Defendants Purico (IOM) Limited, RF & Son, Inc., and Nathu Puri as to Plaintiffs' WARN Act Claims, filed July 30, 2004, is hereby **DENIED;**

4. the Plaintiffs' Motion for Partial Summary Judgment and Adjudication as to WARN Act Claims, filed July 30, 2004, is hereby **DENIED;**

5. the Motion for Summary Judgment of the Purico Defendants and Defendant Steven Smith as to Plaintiffs' ERISA Claims, filed July 30, 2004, is hereby **DENIED;**

6. Plaintiffs' Motion for Stay of Pension Litigation Pending Merger of Pension Plans and for Vacating of Trial Date as [to] the ERISA Case Only, filed August 13, 2004, is hereby **DENIED;**

7. the Plaintiffs' Request for Judicial Notice of a Newly Filed Pleading relevant to Pending Cross Motions for Summary Judgment (WARN Act), filed November 4, 2004, is hereby **ALLOWED;**

8. the Motion for Order Striking Answer and Prohibiting Plaintiff[s] from Obtaining Judgment or Alternatively Denying Plaintiff[s'] Motion for Summary Judgment and Adjourning Trial, filed January 21, 2005, by Langdon M. Cooper as Chapter 7 Trustee for the estates of Defendants RFS Ecusta, Inc., and RFS U.S., Inc., is hereby **DENIED;** and

9. the Motion to Disqualify Troutman Sanders, L.L.P., filed by the Trustee on January 21, 2005, is hereby **DENIED**. However,

**IT IS FURTHER ORDERED** that the parties advise the Court of their positions regarding the possibility that D. Eugene Webb, Jr., will be called as a witness during the trial within 15 days from entry of this Memorandum and Order.

**IT IS FURTHER ORDERED** that the case caption is hereby amended as shown herein to reflect the Trustee's involvement in this action.

**IT IS FURTHER ORDERED** that the Clerk place this matter on the Court's May 2005 civil trial calendar.